ERK:SM/JAN
F.#2007R00237

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

ZEV SALTSMAN,
MENACHEM EITAN,
STEVEN NEWMAN,
EDWARD NEWMAN,
ANDREW BROWN and
MARTIN WEISBERG,

        Defendants.

- - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____
(T. 15, U.S.C., §§ 78j(b)
and 78ff; T. 18, U.S.C.,
§§ 371, 1956(a)(1)(A)(i),
1956(a)(1)(B)(i),
1956(a)(2)(A),
1956(a)(2)(B)(i), 1956(h),
2 and 3551 et seq.)

THE GRAND JURY CHARGES:

## INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

### I.   The Companies and Co-Conspirators

      1.   Ramp Corporation ("Ramp") was a corporation organized under the laws of the State of Delaware, the shares of which were publicly traded on the American Stock Exchange ("AMEX"). Ramp maintained its headquarters in New York, New York, and had shareholders throughout the United States, including in the Eastern District of New York. Ramp's business included the development of computer software for use by healthcare providers to record and manage orders of prescription drugs and laboratory tests.

2.     Xybernaut Corporation ("Xybernaut") was a corporation organized under the laws of the state of Delaware, the shares of which were publicly traded on the National Association of Securities Dealers Automated Quotation System SmallCap Market ("NASDAQ-SCM").  Xybernaut maintained its headquarters in Fairfax, Virginia and had shareholders throughout the United States, including in the Eastern District of New York. Xybernaut's business included the development and distribution of portable computer hardware.

3.     Granot, Strauss, Adar & Co., Inc. ("Granot") was a law firm located in Ramat Gan, Israel.

4.     Turks and Caicos First Secretarial, Ltd. ("TCFS") was a limited company formed under the laws of the United Kingdom that maintained offices in London, England and Grand Turk, Turks and Caicos.  TCFS was in the business of establishing and registering corporations in the Turks and Caicos Islands.

5.     Pond Equities was a broker-dealer, registered with the United States Securities and Exchange Commission, that maintained offices in Brooklyn, New York.

6.     The defendant EDWARD NEWMAN held the positions of Chief Executive Officer and Chairman of the Board of Directors (the "Board") of Xybernaut.

7.     The defendant STEVEN NEWMAN was the brother of EDWARD NEWMAN and held the position of Vice Chairman of the Board

3

of Xybernaut.  From January 2003 through May 2007, he also held
the positions of President and Chief Operating Officer of
Xybernaut.

8.    The defendant ANDREW BROWN was a consultant to
Ramp in or about and between August 2001 and April 2004, after
which he held the positions of President and Chief Operating
Officer of Ramp and he was a member of Ramp's Board.

9.    The defendant ZEV SALTSMAN was a resident of Ginot
Shomron, Israel.

10.    The defendant MENACHEM EITAN was a resident of
Karnei Shamron, Israel.

11.    The following entities (collectively, the "Nominee
Entities"), at various times as set forth below, served as
nominees for the defendants ZEV SALTSMAN and MENACHAM EITAN:

           a.  Cavell Investments Ltd.

           b.  Brookside Financial Ltd.

           c.  Pearl Ltd.

           d.  Green Meadow Finance Ltd.

           e.  Canary Point Ltd.

           f.  Sycamore Properties Ltd.

           g.  Hilltop Services Ltd.

           h.  Cottonwood Ltd.

           i.  Willow Bend Management Ltd.

           j.  Eva Holdings Ltd.

k.  Rema Investments Ltd.

l.  Holly Investments Ltd.

m.  Rambo Investments Ltd.

n.  Chesterfield Ltd.

o.  Essex Ltd.

p.  Sundial Investments Ltd.

q.  Capecove International Ltd.

r.  London Properties Ltd.

s.  Sussex Consulting Ltd.

t.  Volare Overseas Ltd.

u.  Archway Holdings Ltd.

v.  Maple Systems Ltd.

w.  Greta Holdings Ltd.

x.  Western Ventures Ltd.

y.  Polar Properties Ltd.

z.  Company Management Ltd.

aa. State Street Corporation

bb. Reno Holdings Ltd.

cc. Yeshuah Investments Ltd.

dd. Rewell Holdings Ltd.

ee. Firewall Universal Ltd.

ff. Sundale Corporation

gg. Dune Holdings Ltd.

hh. Hazel Investments Ltd.

ii. Bertrand Overseas, Ltd.

jj. Canon Ventures, Ltd.

kk. Samira Management Ltd.

12. The defendant MARTIN WEISBERG was an attorney practicing law in New York, New York and was a member of Xybernaut's Board of Directors.

13. ATTORNEY-1, an individual whose identity is known to the Grand Jury, was an attorney practicing law in New York, New York.

A. Certain Relevant Regulatory Principles

14. As public companies, Xybernaut and Ramp were required to comply with the rules and regulations of the Securities and Exchange Commission ("SEC"). The statutes under which the SEC's rules and regulations were adopted served to protect the investing public by ensuring that investors received accurate information about securities offerings and by prohibiting fraud in the purchase and sale of securities. These disclosure obligations were designed, in part, to prevent self-dealing by corporate managers at the expense of shareholders. Thus, for example, Xybernaut and Ramp were required to make disclosures regarding management compensation and other financial arrangements between management and the companies. In particular, Xybernaut and Ramp were required, at various times, to file the following forms with the SEC:

a.    Registration Statements (on Form S-3) informing investors of the purpose of new stock offerings and disclosing, among other things, the identities of shareholders who owned more than five percent of the stock;

b.    quarterly reports (on Form 10-Q) disclosing, among other things, the number of shares of common stock outstanding; and,

c.    annual reports (on Form 10-K) disclosing, among other things, (i) management compensation; (ii) security ownership of certain beneficial owners, including officers, directors and those beneficial owners of more than five percent of a class of given security; and (iii) transactions with "related persons," which included any director or officer of the registrant, any nominee for a director or any immediate family member of a director or officer of the registrant (hereinafter "Related Party Transactions").

15.    The rules and regulations of the SEC further provided that any individual, entity or group acting together which owned, directly or indirectly, more than five percent of a class of equity securities was required to file with the SEC a statement of ownership (on Schedules 13D or 13G).

B.    Certain Types of Securities Transactions

16.    The term "private investment in public equity," or "PIPE" transaction, referred to a privately negotiated sale of unregistered securities by a public company to certain accredited institutional and individual investors, usually at a discount to the prevailing market price.  The public announcement of a consummated PIPE transaction typically depressed the share price of the company if the PIPE shares were sold at a discount.  The

rules and regulations of the SEC permitted the PIPE investors to
transfer shares originally issued in a PIPE transaction only
after the issuer filed a registration statement for those shares
and the SEC declared the registration statement effective.

17. A "short sale" was the sale of a security that the
seller did not own, made for the purpose of profiting from a
potential decline in the given security's price.  The short-
seller was generally required to borrow the shares sold in the
short sale.  Following the sale of the borrowed shares, the
short-seller later closed out the short position by returning to
the lender an equivalent number of shares of the given security.

18. The term "warrant" referred to a security that
entitled the holder to buy shares of the issuing company at a
specified price at some time in the future.  An owner of a
warrant stood to profit if, on the exercise date of the warrant,
the price of the shares was higher than the price at which the
owner was entitled to buy it pursuant to the warrant.

II.      THE FRAUDULENT SCHEME

19. In or about and between 2001 and 2005, the
defendants ZEV SALTSMAN, MENACHEM EITAN, STEVEN NEWMAN, EDWARD
NEWMAN, ANDREW BROWN and MARTIN WEISBERG devised and carried out
a scheme to defraud the shareholders of Xybernaut and Ramp by
causing Xybernaut and Ramp secretly to issue discounted PIPE
shares to SALTSMAN and EITAN via the Nominee Entities.  In

exchange, SALTSMAN and EITAN paid STEVEN NEWMAN, EDWARD NEWMAN, BROWN and WEISBERG undisclosed kickbacks.  In order to lock in a profit from their receipt of the discounted PIPE shares, SALTSMAN and EITAN established large short positions in Xybernaut and Ramp stock prior to their receipt of the PIPE shares.  Following the announcement of the PIPEs and the resulting drop in market price, defendants SALTSMAN and EITAN used the discounted PIPE shares to cover their short positions, thereby profiting from the drop in price of the shares.

20.  As set forth in greater detail below, through the scheme to defraud, SALTSMAN and EITAN generated approximately $16 million in profits in short-sale transactions in Ramp shares during the years 2002 through 2004 and approximately $39 million in profits in trades of Xybernaut shares during the years 2001 through 2004.

21.  The SEC rules and regulations described above required that several aspects of these transactions be disclosed, including as management compensation, compensation to controlling persons and/or Related Party Transactions.  The defendants, however, in order to conceal their scheme, consistently failed to make required disclosures in SEC filings.  These material omissions served to prevent the SEC and Xybernaut's and Ramp's shareholders from learning the full extent of the defendants' compensation and beneficial ownership of stock as a result of the

undisclosed Related Party Transactions.  These omissions further
served to hide the true state of the companies' deteriorating
finances and operations.

A.  The Ramp Scheme

22.  In or about and between December 2002 and July
2004, both dates being approximate and inclusive, Ramp executed
ten PIPE transactions and numerous other financial transactions
with at least 13 different Nominee Entities controlled by the
defendants ZEV SALTSMAN and MENACHEM EITAN.  In connection with
these PIPE transactions, the Nominee Entities obtained
approximately 162,000,000 shares of Ramp common stock at
substantial discounts to the market price.  The defendant ANDREW
BROWN negotiated and approved the majority of these PIPE
transactions on Ramp's behalf.

23.  In the SEC filings for the ten PIPE transactions,
Ramp never disclosed that the Nominee Entities were related to
one another, despite the fact that each was controlled by the
defendants ZEV SALTSMAN and MENACHEM EITAN.  Instead, in each of
these filings, Ramp falsely stated that the relevant Nominee
Entity was controlled by an employee of either Granot or TCFS,
when in fact these individuals were nominees of SALTSMAN and
EITAN.  ANDREW BROWN signed the Form S-3 registration statements
filed with the SEC for each of the three PIPE transactions
executed between Ramp and the Nominee Entities after BROWN became

Ramp's President and Chief Operating Officer in or about October 2003.

### i. Misrepresentations and Omissions in Communications Regarding Certain Ramp PIPE Transactions

24. On or about and between April 11, 2003 and June 12, 2003, Ramp entered into three PIPE transactions ("PIPEs 1 through 3") with Nominee Entities Bertrand Overseas, Ltd., Cavell Investments Ltd., Pearl Ltd. and Brookside Financial Ltd. On or about June 4, 2003, Ramp filed a Form S-3 registration statement disclosing PIPEs 1 through 3 and requesting registration of the PIPE shares purchased in these transactions (the "June 2003 S-3").

25. On or about and between July 29, 2003 and September 11, 2003, Ramp entered into separate PIPE transactions with Nominee Entity Green Meadow Finance Ltd. and Markham Holdings Ltd. ("PIPE 4") and Nominee Entity Sycamore Properties Ltd. ("PIPE 5"), respectively.

26. On September 22, 2003, the SEC issued a "comment letter" to Ramp requesting that Ramp provide additional disclosure in connection with the June 2003 S-3 registration statement (the "Comment Letter"). Among other things, the SEC requested that Ramp disclose any additional financing transactions entered into by Ramp subsequent to the purchase agreements executed PIPEs 1 through 3.

11

27.  Had Ramp disclosed, in response to the Comment Letter, that it had consummated PIPEs 4 and 5, that disclosure would likely have delayed the registration of the shares purchased in PIPEs 1 through 3.  Because SALTSMAN and EITAN's trading strategy required them to use PIPE shares to cover open short positions, however, they needed those shares registered as quickly as possible.

28.  On or about September 23, 2003, the defendants ZEV SALTSMAN, MENACHEM EITAN, ANDREW BROWN, MARTIN WEISBERG and ATTORNEY-1, together with others, met to discuss Ramp's response to the Comment Letter and agreed to conceal the existence of PIPES 4 and 5 from the SEC ("the September 23, 2003 Agreement").

29.  In a letter to the SEC dated September 29, 2003, on behalf of Ramp, WEISBERG falsely stated that Ramp "has not made, and is not making, any offers of its securities during the pendency of the [June 2003 S-3] Registration Statement."

30.  At WEISBERG's direction, and in response to the Comment Letter, Ramp filed an amendment to the June 2003 S-3 on or about September 30, 2003, which likewise failed to disclose the existence of PIPEs 4 and 5.

31.  In or about October 2003, Ramp's outside auditor requested information about the receipt of funds associated with PIPEs 4 and 5.  In response to the inquiry, the defendant MARTIN WEISBERG took additional steps to conceal the existence of PIPEs

4 and 5 by preparing three "Waiver and Termination Agreements" with the defendants ZEV SALTSMAN and MENACHEM EITAN's Nominee Entities, which purported to terminate the convertible securities from PIPE transactions 4 and 5 in exchange for what they characterized as "promissory notes" (the "Promissory Notes"). The purpose of the Waiver and Termination Agreements and the Promissory Notes was to temporarily recast the monies received in PIPEs 4 and 5 as loans from the Nominee Entities to Ramp, rather than as the equity investments they were (and the existence of which Ramp had denied to the SEC).

ii.  $50,000 Kickback to the Defendant ANDREW BROWN

32.  In or about December 2003, the defendant ZEV SALTSMAN gave defendant ANDREW BROWN, then Ramp's president and CEO, approximately $50,000 in cash (the "$50,000 Kickback") in return for BROWN's agreement to execute PIPE transactions with Nominee Entities controlled by the defendants SALTSMAN and MENACHEM EITAN.

iii.  Misrepresentations Concerning the Election of Ramp Directors

33.  On or about March 4, 2004, Ramp executed a $5,000,000 PIPE transaction with Nominee Entity Hilltop Services Ltd. ("Hilltop") ("PIPE 6").  The defendants ZEV SALTSMAN and MENACHEM EITAN, with the knowledge and assistance of the defendants ANDREW BROWN and MARTIN WEISBERG, then used the threat of withdrawing the $5,000,000 Hilltop investment to: (1) force

the resignation of three of the six Ramp directors; (2) name two new directors designated by SALTSMAN and EITAN; and (3) thwart efforts to remove BROWN as Ramp's Chief Operating Officer.

34. Faced with the threat of losing Hilltop's $5,000,000 investment, which was necessary for Ramp's continued operations, on or about March 29, 2004, Ramp's board of directors acquiesced to SALTSMAN and EITAN's demands. In its 2003 Form 10-K, prepared by ATTORNEY-1, reviewed by WEISBERG, signed by BROWN and filed with the SEC on or about April 14, 2004, Ramp omitted any mention of SALTSMAN or EITAN's role in the change in Ramp's board of directors. Instead, the Form 10-K falsely stated that "this change was made to avoid the possibility of a deadlocked Board with an evenly split vote." These same misrepresentations appeared in Ramp's first quarter 2004 Form 10-Q, prepared by ATTORNEY-1, signed by BROWN and filed with the SEC on or about May 17, 2004.

      iv.   $1.92 Million Payment to the Defendants
           ZEV SALTSMAN and MENACHEM EITAN

35. In connection with PIPE 6, Ramp granted Hilltop an "anti-dilution" clause, which gave Hilltop the right to purchase additional Ramp shares at a reduced price in the event that other "third party" investors purchased shares at a better price in a later deal.

36. An "anti-dilution" clause is a provision in a convertible security that protects the holders of an investment

14

from dilution as the result of later issuances of stock at a
lower price than the investor paid.  Anti-dilution clauses
typically operate by providing for the delivery of additional
shares of stock to the beneficiary of the anti-dilution clause in
the event that shares are issued to a third party at a lower
price.

37.  On or about July 14, 2004, Ramp executed a PIPE
transaction with Nominee Entities Cottonwood Ltd. and Willow Bend
Management Ltd. ("PIPE 7").

38.  Following the execution of PIPE 7, and in a
purported effort to comply with the anti-dilution clause
contained in PIPE 6, Ramp granted Hilltop a "promissory note"
(the "Hilltop Promissory Note") in the amount of $1.92 million,
convertible into 6,400,000 shares at $.30 per share, plus
additional Ramp shares and warrants with steeply discounted
exercise prices.  Ramp issued the Hilltop Promissory Note despite
the fact that the ultimate investors in PIPE 6, namely the
defendants ZEV SALTSMAN and MENACHEM EITAN, were the same as
those from PIPE 7, making the operation of the anti-dilution
clause a sham.

39.  On or about July 15, 2004, Ramp disseminated a
press release announcing the execution of the PIPE 7 purchase
agreement the previous day.  This press release was materially
misleading in that it omitted any reference to PIPE 6, or the

Hilltop Promissory Note, or to the role of the related parties involved in the sham transaction.

40.  On or about August 20, 2004, Ramp filed a Form S-3, signed by the defendant ANDREW BROWN and prepared by the defendant MARTIN WEISBERG, disclosing the terms of PIPE 6 and seeking to register the shares purchased in that transaction, but omitting the fact that Hilltop was controlled by the same two Nominee Entities that invested in PIPE 7.

v.    Failures to Adequately Disclose Ownership as Required on Schedules 13D

41.  On many occasions throughout the period during which the defendants ZEV SALTSMAN and MENACHEM EITAN used the Nominee Entities to purchase discounted shares of Ramp stock, SALTSMAN and EITAN owned and controlled more than five percent of Ramp's outstanding shares.  SALTSMAN and EITAN, however, repeatedly failed to report their true interest in, and control over, Ramp as they were required to do on Schedule 13D, which mandates the disclosure of an ownership interest totaling more than five percent of a company's outstanding shares within 10 days after acquiring such an interest.  By refusing to comply with Schedule 13D's requirements, SALTSMAN and EITAN persistently concealed the true extent of their ownership interest in, and control over, Ramp.

42.  On various occasions in or about and between June 2003 and August 2004, the Nominee Entities together acquired an

ownership interest of more than five percent of Ramp's

outstanding shares (including shares authorized for issuance upon

the exercise of warrants).  These occasions include the

following:

a.   On or about and between April 11, 2003, Nominee
     Entity Bertrand Overseas Ltd. acquired
     approximately 7.8% of Ramp's outstanding shares.

b.   On or about June 12, 2003, Nominee Entity Pearl
     Ltd. acquired approximately 6% of Ramp's
     outstanding shares.

c.   On or about June 20, 2003, Nominee Entity
     Brookside Financial Ltd. acquired approximately
     5.4% of Ramp's outstanding shares.

d.   On or about and between October 28, 2003, Nominee
     Entities Canary Point Ltd. and Firewall Universal
     Ltd. together acquired approximately 14.4% of
     Ramp's outstanding shares.

e.   On or about November 15, 2003, Nominee Entities
     Cavell Investments Ltd., Green Meadow Finance,
     Ltd. and Sycamore Properties Ltd. together
     acquired approximately 12.1% of Ramp's outstanding
     shares.

f.   On or about December 31, 2003, Nominee Entity
     Canon Ventures, Ltd. acquired approximately 7.3%
     of Ramp's outstanding shares.

g.   On or about March 4, 2004, Nominee Entity Hilltop
     Services, Ltd. acquired approximately 7.7% of
     Ramp's outstanding shares.

h.   On or about July 14, 2004, Nominee Entities Willow
     Bend Management, Ltd., Hilltop Services, Ltd. and
     Cottonwood, Ltd. together acquired approximately
     37% of Ramp's outstanding shares.

43.  On each of these occasions, ZEV SALTSMAN and

MENACHEM EITAN should have filed a Schedule 13D or an amended

Schedule 13D reflecting their true ownership interest in Ramp. SALTSMAN and EITAN, however, failed to make any Schedule 13D filings with the SEC.

B.  The Xybernaut Scheme

44.  In or about and between April 2001 and December 2004, both dates being approximate and inclusive, Xybernaut executed 14 PIPE transactions and several other financial transactions with at least 21 Nominee Entities controlled by the defendants ZEV SALTSMAN and MENACHEM EITAN.  In connection with these PIPE transactions, the Nominee Entities obtained approximately 127,000,000 shares of Xybernaut common stock at substantial discounts to the prevailing market price.  The defendant STEVEN NEWMAN negotiated and approved these PIPE transactions on Xybernaut's behalf.

45.  In the SEC filings associated with the 14 PIPE transactions, Xybernaut failed to disclose that the Nominee Entities were related to one another by virtue of SALTSMAN and EITAN's secret ownership.  Instead, in each case, Xybernaut falsely stated that the relevant Nominee Entity was controlled by an individual who was an employee of either Granot or TCFS. Several such employees were listed in the relevant filings, sometimes as controlling more than one Nominee Entity, and their affiliations with Granot or TCFS were omitted in each instance.

i.    EDWARD NEWMAN'S March 2002 Undisclosed Self-
Dealing

46.    In or about March 2002, Xybernaut completed a
$5,000,000 PIPE transaction with two entities, Alpha Capital and
Cranshire Capital ("PIPE 8").  On or about March 14, 2002 and
March 15, 2002, Alpha Capital and Cranshire Capital wire-
transferred a total of $5,000,000 to an escrow account at
WEISBERG's law firm ("WEISBERG's Escrow Account").  On or about
March 14, 2002 and March 15, 2002, WEISBERG's Escrow Account
wire-transferred $4,850,000 to a Xybernaut bank account, leaving
approximately $150,000 remaining in WEISBERG's Escrow Account.

47.    According to Xybernaut's internal records, a three
percent finders' fee, equal to $150,000, was associated with PIPE
8.  On or about April 12, 2002, pursuant to WEISBERG's
instructions, $100,000 of the $150,000 remaining in WEISBERG's
Escrow Account was wired to a bank account held by the defendant
EDWARD NEWMAN and his wife.

48.    As an executive officer of Xybernaut, EDWARD
NEWMAN's compensation was required to be disclosed in Xybernaut's
SEC filings.  At no time, however, did Xybernaut disclose, in SEC
filings or elsewhere, that the defendant EDWARD NEWMAN received a
"finder's fee" or any other compensation in connection with this
transaction.  Specifically, Xybernaut's Form 10-Q filing for the
first quarter of 2002, signed by EDWARD NEWMAN and filed with the
SEC on or about May 15, 2002, and Xybernaut's Form 10-Q filing

for the second quarter of 2002, signed by EDWARD NEWMAN and filed with the SEC on or about August 13, 2002, stated that certain funds were paid in connection with PIPE 8 to "financial advisors," but materially omitted to state that EDWARD NEWMAN received a portion of such fees.

ii.   The July 2002 Undisclosed Warrant Repricing

49.   On or about July 12, 2002, Xybernaut filed with the SEC a Form S-3 seeking to register shares issued in a PIPE transaction to, among other investors, Nominee Entity Rema Investments Limited ("Rema") ("PIPE 9"). As a term of Rema's investment, 1,544,361 warrants that had been previously issued to three other Nominee Entities were repriced from between $2.55 and $4.53 per share to $.50 per share. The repricing constituted a substantial financial benefit to the defendants ZEV SALTSMAN and MENACHEM EITAN.

50.   The July 12, 2002 Form S-3, prepared by the defendant MARTIN WEISBERG and signed by WEISBERG and the defendants STEVEN NEWMAN and EDWARD NEWMAN, materially omitted to disclose that the company had conferred this benefit on controlling persons ZEV SALTSMAN and MENACHEM EITAN by significantly reducing the price of their warrants as one of the terms of Rema's investment.

### iii. Undisclosed Kickbacks to the Defendants
STEVEN NEWMAN and MARTIN WEISBERG

51.  On or about and between August 27, 2003 and February 5, 2004, the defendants ZEV SALTSMAN and MENACHEM EITAN wire-transferred approximately $2.4 million in kickbacks to the defendant STEVEN NEWMAN and $1.7 million in kickbacks to the defendant MARTIN WEISBERG.  These kickbacks represented compensation to STEVEN NEWMAN and WEISBERG for, among other things, causing Xybernaut to enter into several PIPE transactions with the Nominee Entities.  In particular:

a.  On or about August 27, 2003, SALTSMAN and EITAN wire-transferred approximately $600,000, previously generated through Ramp PIPE transactions, from an account maintained at Barclays Bank in London under the name of TCFS (the "TCFS Account") to WEISBERG's Escrow Account.  On or about September 5, 2003, the defendant MARTIN WEISBERG instructed the accounting department of his law firm to send $300,000 for future payment of the mortgages on properties owned by the defendant STEVEN NEWMAN.  Of the remaining $300,000, WEISBERG invested $225,000 on his own behalf.

b.  On or about November 12, 2003, SALTSMAN and EITAN wire-transferred approximately $1,000,000, representing the proceeds of the sale of stock acquired in PIPE transactions, from the TCFS Account to an attorney escrow account that WEISBERG maintained separately from his law firm (hereinafter, "WEISBERG's Personal Escrow Account").  On or about December 12, 2003, WEISBERG transferred approximately $500,000 to two banks on behalf of the defendant STEVEN NEWMAN.

c.  In or about and between January 20, 2004 and February 5, 2004, SALTSMAN and EITAN wire-

transferred approximately $1.5 million, representing the proceeds of the sale of stock acquired in PIPE transactions, to the defendant MARTIN WEISBERG's Personal Escrow Account. On or about and between April 12, 2004 and June 2, 2004, WEISBERG transferred approximately $660,000 to accounts for the benefit of the defendant STEVEN NEWMAN.

d.   On or about January 21, 2004, Nominee Entity Samira Management Ltd. wire-transferred approximately $1,000,000 from a bank account in Switzerland to trust accounts controlled by STEVEN NEWMAN.

52.   These payments were required to be disclosed as management compensation to STEVEN NEWMAN. At STEVEN NEWMAN's direction, however, Xybernaut never publicly disclosed, in filings with the SEC or otherwise, that STEVEN NEWMAN received approximately $2.4 million from the defendants ZEV SALTSMAN and MENACHEM EITAN during 2003 and 2004 in his capacity as President of Xybernaut, despite the fact that SALTSMAN and EITAN, through the entities they controlled, were the primary source of Xybernaut's financing during the period STEVEN NEWMAN received these funds. Likewise, at the direction of the defendant MARTIN WEISBERG and others, Xybernaut never publicly disclosed, in filings with the SEC or otherwise, that WEISBERG had received $1.7 million from SALTSMAN and EITAN in his capacity as a Xybernaut director and outside counsel.

53.   On or about April 26, 2004, Xybernaut filed a Form 10-K for the year 2003 (the "2003 Form 10-K") with the SEC. The 2003 Form 10-K was prepared by MARTIN WEISBERG and signed by the

defendants STEVEN NEWMAN and EDWARD NEWMAN.  The "Executive
Compensation" section of the 2003 Form 10-K stated, in substance
and in part, that in 2003, STEVEN NEWMAN was paid a salary of
approximately $296,730 and received options to purchase 300,000
Xybernaut shares, and $94,164 in additional compensation.  The
"Compensation of Directors" section of the 2003 Form 10-K stated,
in substance and in part, that Xybernaut's directors, including
WEISBERG, were paid $1,000 per board meeting and received options
to purchase 10,000 Xybernaut shares annually.  The 2003 Form 10-K
materially omitted any reference to the hundreds of thousands of
dollars that WEISBERG and STEVEN NEWMAN received in exchange for
causing Xybernaut to enter into the PIPE transactions with the
Nominee Entities.  These omissions rendered the disclosures made
materially false and misleading.

> iv.  Failures to Adequately Disclose Ownership as
>      Required on Schedules 13D

54.  On many occasions throughout the period during
which the defendants ZEV SALTSMAN and MENACHEM EITAN used
their Nominee Entities to purchase shares of Xybernaut stock,
SALTSMAN and EITAN owned and controlled more than five percent of
Xybernaut's outstanding shares.  SALTSMAN and EITAN, however,
repeatedly failed to report their true interest in Xybernaut as
required by Schedule 13D, which mandates that individuals and
entities disclose their ownership of more than five percent of a
company's outstanding shares.

55.  On various occasions in or about and between July 2001 and December 2004, the Nominee Entities together acquired an ownership interest of more than five percent of Xybernaut's outstanding shares (including shares authorized for issuance upon the exercise of warrants).  These occasions include the following:

a.   On or about June 30, 2002, Nominee Entities Rema Investments Ltd., Dune Holdings Ltd, Yeshua Investments Ltd., Holly Investments Ltd. and Eva Holdings Ltd. together acquired approximately 6.4% of Xybernaut's outstanding shares.

b.   On or about August 29, 2002, Nominee Entities Rewell Holdings Ltd. and Sundale Corporation together acquired approximately 15.3% of Xybernaut's outstanding shares.

c.   On or about November 6, 2002, Nominee Entities Greta Holdings Ltd., Reno Holdings Ltd., State Street Corporation and Company Management Ltd. together acquired approximately 18.6% of Xybernaut's outstanding shares.

d.   On or about April 1, 2003, Nominee Entities Maple Systems Ltd. and Sundial Investments Ltd. together acquired approximately 9.1% of Xybernaut's outstanding shares.

e.   On or about June 4, 2003, Nominee Entities Capecove International Ltd., London Properties Ltd. and Sussex Consulting Ltd. together acquired approximately 12.8% of Xybernaut's outstanding shares.

f.   On or about September 8 and September 16, 2003, respectively, Nominee Entities Sundial Investments Ltd., Chesterfield Inc. and Essex Trading Ltd. together acquired approximately 7.2% of Xybernaut's outstanding shares.

     g.    On or about December 20, 2004, Nominee Entities
Western Ventures Ltd. and Polar Properties Ltd.
together acquired approximately 8.7% of
Xybernaut's outstanding shares.

56.   Despite these acquisitions, through the Nominee
Entities, of more than five percent of Xybernaut's outstanding
shares, ZEV SALTSMAN and MENACHEM EITAN failed to make the
required Schedule 13D filings with the SEC.  Indeed, SALTSMAN and
EITAN failed to file any Schedule 13D's at any time, thus
successfully concealing their true ownership interest in, and
control over, Xybernaut.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

57.   The allegations contained in paragraphs one
through 56 are hereby realleged and incorporated as if set forth
fully in this paragraph.

58.   In or about and between April 2001 and December
2004, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants ZEV
SALTSMAN, MENACHEM EITAN, STEVEN NEWMAN, EDWARD NEWMAN, ANDREW
BROWN and MARTIN WEISBERG, together with others, did knowingly
and willfully conspire to use and employ manipulative and
deceptive devices and contrivances, directly and indirectly, in
violation of Rule 10b-5 of the Rules and Regulations of the SEC
(Title 17, Code of Federal Regulations, Section 240.10b-5), in
that the defendants did knowingly and willfully conspire,
directly and indirectly, to (a) employ devices, schemes, and

artifices to defraud; (b) make untrue statements of material fact
and omit to state material facts necessary in order to make the
statements made, in light of the circumstances in which they were
made, not misleading; and (c) engage in acts, practices, and
courses of business which would and did operate as a fraud and
deceit upon members of the investing public, in connection with
the purchases and sales of Ramp and Xybernaut securities, and by
use of the means and instrumentalities of interstate commerce and
the mails, in violation of Title 15, United States Code, Sections
78j(b) and 78ff.

59.   In furtherance of the conspiracy and to effect its
objectives, within the Eastern District of New York and
elsewhere, the defendants ZEV SALTSMAN, MENACHEM EITAN, STEVEN
NEWMAN, EDWARD NEWMAN, ANDREW BROWN and MARTIN WEISBERG, together
with others, committed and caused to be committed, among others,
the following:

OVERT ACTS

a.   On or about May 15, 2002, the defendant
EDWARD NEWMAN caused Xybernaut to file a Form 10-Q with the SEC
referencing fees paid to financial advisors in connection with
PIPE 8 but failing to disclose that EDWARD NEWMAN had received a
majority of those fees.

b.   On or about September 30, 2003, Ramp filed a
Form S-3, amending for a fourth time the Form S-3 filed on or

about June 4, 2003 and prepared by the defendant MARTIN WEISBERG, with the SEC seeking to register shares on behalf of Nominee Entities Bertrand Overseas Ltd., Cavell Investments Ltd., Pearl Ltd. and Brookside Financial Ltd. that omitted any reference to PIPES 4 and 5.

   c. On or about April 14, 2004, the defendant ANDREW BROWN caused Ramp to file a Form 10-K, which was reviewed by the defendant MARTIN WEISBERG, that failed to disclose the $50,000 gift given to BROWN by the defendant ZEV SALTSMAN and omitting any mention of the defendants ZEV SALTSMAN's and MENACHEM EITAN's role in the change in Ramp's Board.

   d. On or about April 26, 2004, the defendants STEVEN NEWMAN and EDWARD NEWMAN caused Xybernaut to file a Form 10-K with the SEC that failed to disclose that the defendants MARTIN WEISBERG and STEVEN NEWMAN had received substantial sums of money from the defendants ZEV SALTSMAN and MENACHEM EITAN.

   e. On or about May 17, 2004, the defendant ANDREW BROWN caused Ramp to file a Form 10-Q, prepared by the defendant MARTIN WEISBERG, with the SEC omitting any mention of the defendants ZEV SALTSMAN's and MENACHEM EITAN's role in the change in Ramp's Board.

   (Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT TWO</u>
(Securities Fraud - Ramp)

60.   The allegations contained in paragraphs one through 43 are realleged and incorporated as if set forth fully in this paragraph.

61.   In or about and between December 2002 and July 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ZEV SALTSMAN, MENACHEM EITAN, ANDREW BROWN and MARTIN WEISBERG, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances, directly and indirectly, in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants did knowingly and willfully, directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of Ramp securities, and by use of the means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 <u>et seq.</u>)

COUNT THREE
(Securities Fraud - Xybernaut)

62.   The allegations contained in paragraphs one through 22 and 44 through 56 are repeated and incorporated as if set forth fully in this paragraph.

63.   In or about and between August 2001 and December 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ZEV SALTSMAN, MENACHEM EITAN, STEVEN NEWMAN and EDWARD NEWMAN, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances, directly and indirectly, in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants did knowingly and willfully, directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of Xybernaut securities, and by use of

the means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT FOUR
(Money Laundering Conspiracy)

64.   The allegations contained in paragraphs one through 56 are realleged and incorporated as if set forth fully in this paragraph.

65.   In or about and between April 2002 and June 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ZEV SALTSMAN, MENACHEM EITAN, MARTIN WEISBERG, STEVEN NEWMAN and EDWARD NEWMAN, together with others, did knowingly and intentionally conspire to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit: securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, knowing that the property involved in such financial transactions represented proceeds of some form of unlawful activity, (a) with the intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the

30

ownership, and the control of such proceeds, in violation of
Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

### COUNTS FIVE through THIRTEEN
(Money Laundering - Domestic Transactions)

66.    The allegations contained in paragraphs one
through 56 are realleged and incorporated as if set forth fully
in this paragraph.

67.    On or about the dates set forth below, within the
Eastern District of New York and elsewhere, the defendants ZEV
SALTSMAN and MENACHEM EITAN, together with others, knowing that
the property involved in financial transactions represented the
proceeds of some form of unlawful activity, did knowingly and
intentionally conduct and attempt to conduct financial
transactions affecting interstate and foreign commerce which in
fact involved the proceeds of specified unlawful activity, to
wit, securities fraud, in violation of Title 15, United States
Code, Sections 78j(b) and 78ff, (a) with the intent to promote
the carrying on of the specified unlawful activity, and (b)
knowing that the transactions were designed in whole and in part
to conceal and disguise the nature, the location, the source, the
ownership, and the control of such proceeds, in that the
defendants transferred and caused to be transferred funds as
specified below:

| COUNT | DATE | FROM | TO | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| 5 | 1/2/03 | Bank of New York Account No. 630-0281050 | Carmen Ltd., Bank of Butterfield Account No. 73038 | $1,500,000 |
| 6 | 5/8/03 | Dune Holdings, Ltd., Pond Equities Account No. HXL-957739 | Samira Management Ltd., Deutsche Bank | $750,000 |
| 7 | 8/13/03 | Dune Holdings, Ltd., Pond Equities Account No. HXL-957739 | Bank of New York Account No. 630-0281050 | $1,500,000 |
| 8 | 8/20/03 | Bank of New York Account No. 630-0281050 | TCFS Services Client Account, Barclays Bank Account No. 68400666 | $515,000 |
| 9 | 10/17/03 | White Investments, Ltd., Pond Equities Account No. HXL-958255 | Bank of New York Account No. 630-0281050 | $2,000,000 |
| 10 | 11/3/03 | Dune Holdings, Ltd., Pond Equities Account No. HXL-957739 | Bank of New York Account No. 630-0281050 | $2,212,523 |

| COUNT | DATE | FROM | TO | APPROXIMATE AMOUNT |
|-------|------|------|----|--------------------|
| 11 | 12/2/03 | Cavell Investments, Ltd., Pond Equities Account No. HXL-958042 | Bank of New York Account No. 630-0281050 | $2,317,387 |
| 12 | 1/8/04 | Bank of New York, Account No. 630-0281050 | TCFS Services Client Account, Barclays Bank Account No. No. 68400666 | $940,000 |
| 13 | 1/28/04 | Bank of New York Account No. 630-0281050 | TCFS Services Client Account, Barclays Bank Account No. No. 68400666 | $965,000 |

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 <u>et</u> <u>seq</u>.)

COUNTS FOURTEEN through NINETEEN
(Money Laundering - International Transactions)

68.     The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

69.     On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants ZEV SALTSMAN and MENACHEM EITAN, together with others, transmitted and transferred funds to a place in the United States from and through a place outside the United States: (a) with the intent to promote the carrying on of specified unlawful activity, to wit:

securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and (b) knowing that the funds involved in the transmissions and transfers represented the proceeds of some form of unlawful activity and that such transmissions and transfers were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit: securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff:

| COUNT | DATE | FROM | TO | APPROXIMATE AMOUNT |
|-------|------|------|-----|---------------------|
| 14 | 8/27/03 | TCFS Services Client Account, Barclays Bank Account No. 68400666 | WEISBERG's Escrow Account, J.P. Morgan Chase Bank Account No. 323231195 | $600,000 |
| 15 | 11/19/03 | TCFS Services Client Account, Barclays Bank Account No. 68400666 | WEISBERG's Personal Escrow Account, J.P. Morgan Chase Bank Account No. 771-6034724 | $750,000 |
| 16 | 1/20/04 | TCFS Services Client Account, Barclays Bank Account No. 68400666 | WEISBERG's Personal Escrow Account, J.P. Morgan Chase Bank Account No. 771-6034724 | $300,000 |

| COUNT | DATE | FROM | TO | APPROXIMATE AMOUNT |
|-------|------|------|-----|--------------------|
| 17 | 1/23/04 | TCFS Services Client Account, Barclays Bank Account No. No. 68400666 | WEISBERG's Personal Escrow Account, J.P. Morgan Chase Bank Account No. 771-6034724 | $300,000 |
| 18 | 1/27/04 | TCFS Services Client Account, Barclays Bank Account No. No. 68400666 | WEISBERG's Personal Escrow Account, J.P. Morgan Chase Bank Account No. 771-6034724 | $300,000 |
| 19 | 2/5/04 | TCFS Services Client Account, Barclays Bank Account No. No. 68400666 | WEISBERG's Personal Escrow Account, J.P. Morgan Chase Bank Account No. 771-6034724 | $275,000 |

(Title 18, United States Code, Sections 1956(a)(2)(A), 1956(a)(2)(B)(i), 2 and 3551 et seq.)

A TRUE BILL

_George a. Rhodes_
FOREPERSON

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:_____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

## INFORMATION SHEET

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1.  Title of Case:  **United States v. Zev Saltsman et al.**

2.  Related Magistrate Docket Number(s):

    None ( X )

3.  Arrest Date:

4.  Nature of offense(s):  ☒   Felony
                           ☐   Misdemeanor

5.  Related Cases - Title and Docket No(s).  (Pursuant to Rule 50.3 of the
    Local E.D.N.Y. Division of Business Rules): _____
    _____
    _____

6.  Projected Length of Trial:   Less than 6 weeks   ( )
                                  More than 6 weeks   ( X )

7.  County in which crime was allegedly committed:  __Kings_____
    (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.  Has this indictment/information been ordered sealed?   (X) Yes  ( ) No

9.  Have arrest warrants been ordered?   (X) Yes  ( ) No


                          ROSLYNN R. MAUSKOPF
                          UNITED STATES ATTORNEY

                     By:  _____
                          John A. Nathanson
                          Assistant U.S. Attorney
                          718-254-7492


Rev. 3/22/01