REDACTED

## **PRELIMINARY STATEMENT**

The defense submits this memorandum in connection with the sentencing of our client, Martin Weisberg, to be scheduled at the status conference on March 15, 2013. As set forth herein, Marty comes before Your Honor for sentencing filled with shame and deeply remorseful for the conduct that has brought him to this day. After three decades of almost singular focus putting in long hours to build a respectable corporate law practice, Marty's serious lapses in judgment have resulted in the surrender of his law license and, with it, the loss of his professional reputation and identity. Marty's missteps have disgraced him in his community and destroyed the life and career he has known for over three decades.

As reflected in the many letters to the Court submitted herewith, Marty has provided loyal counsel and advice to a long list of clients and friends over three decades, including many who are less fortunate and have found themselves in need of his compassion and professional guidance. These letters describe a man of modest upbringing by parents who were the children of immigrants and taught him to value family, work hard, and extend himself to others in the community. They describe a man who was profoundly affected by the death of his parents and has provided comfort to others at times of similar loss. They describe a man who, together with his wife of 31 years,                                        , and who has continued to support and protect his wife and two young teenage children

1

REDACTED

we ask the Court to weigh carefully the significant needs of Marty's family and his many positive contributions during his lifetime, as well as the other facts set forth herein, in deciding the minimum sentence "sufficient, but not greater than necessary" to fulfill the requirements of 18 U.S.C. § 3553(a). In recognition of the devastating impact an incarceratory sentence would have on both of Marty's children and his wife, the severe collateral consequences to his career and livelihood as a result of his conviction, and the non-prison outcomes for his co-defendants in the case that began these proceedings, we ask this Court to sentence the defendant to a term of probation.

## A. Defendant's Background and Family Circumstances

Marty was born on            1950 and raised in a modest household in Brooklyn and then Long Island. An only child, he was very close with his mother, a schoolteacher and later a social worker for mentally challenged children for the Board of Education of Nassau County, who doted on him. He deeply respected his father, a CPA and decorated veteran of World War II. Marty grew up surrounded by his extended family, including cousins who admired and looked up to him. His cousin Nadine Kaplan describes Marty's influence on her and her sisters during their development years:

> Growing up, my sisters and I would count down the days until we were going to see Martin, not only because he was our only cousin, but because he was our role model and our entertainment. Having Martin spend time with us during holidays made each one so special.

*See* Nadine Kaplan letter, Tab C.

The children of immigrants, Marty's parents instilled in him the values of education and hard work. That upbringing led Marty to strive to excel in school, going on to Union College and the London School of Economics, where he graduated summa cum laude and was elected to

2

Phi Beta Kappa, and where he made life-long friends who to this day consider Marty among their most trusted confidants. Dr. Mitchell H. Davich describes the values Marty has exemplified over the 40 years they have remained close friends. He writes that they share a common background in families deeply impacted by the immigrant experience:

> Family values, education and work ethic were the means by which such families gained the opportunity to rise above poverty and make a better life for the next generation.

*See* Mitchell Davich letter, Tab D.

Marty went on to law school at Northwestern University where he graduated first in his class, was Order of the Coif, and was an Articles Editor of the Law Review. Upon completion of law school, he began his legal career as an associate at Cravath, Swaine & Moore, and over subsequent decades went on to become a partner at the New York offices of various national and global law firms.

## 1. The Defendant's Wife and

As a young lawyer in 1977, Marty was set up on a blind date with Tracey Bernhardt, who was actively engaged in her own career at that time. Raised in New Mexico, Tracey had worked out west for many years as a nutritionist for Head Start and early intervention programs like Meals-on-Wheels for both children and seniors, and had recently relocated to New York City to transition her career into national marketing in the retail sector. Their relationship blossomed into what would become a 31-year marriage of two individuals who have retained their deep emotional connection despite the stresses and strains – including those caused by the impact of Marty's legal matters – that would test their commitment to each other in the years to come. *See* Tracey Weisberg Letter, Tab B.

REDACTED

They married in 1981, when Marty and Tracey were both 31 years old.  After many years building their respective careers, work related travel and the late hours those efforts required, Marty and Tracey found themselves in their 40's and eager to have children to complete their lives together.

In 1997, Marty and Tracey, each 47 years old,                               , days after joining Marty's parents in celebrating their 50th wedding anniversary with friends and family from all of the chapters of their lives, an event planned and hosted by Tracey and Marty. Marty's parents, then in the twilight of their lives, became grandparents for the first time.  A relatively older mother with a young child, Tracey left her career to remain at home full-time. Blessed with a beautiful daughter, Tracey and Marty

The joy Marty felt at becoming a father was apparent to those around him.

Grateful for the opportunity to be parents, Marty and Tracey shared their experience with other couples, helping to guide them                               William and Diane Adams explain in their letter how Marty and Tracey assisted them:

                                                                    ….The
Weisbergs invited us to their home to discuss their own journey
                The willingness of others to share their own experience is often a great benefit to those who are about to undertake it, and we greatly appreciated it.

REDACTED

*See* Adams letter, Tab E.

Marty continued to work long hours in his corporate law practice as Tracey took primary day-to-day responsibility for the children.

The SEC disclosed its investigation of Marty's role in the PIPEs matter in 2005, commencing with his investigative testimony in April of that year.  Marty subsequently sat for three more days of testimony in the SEC investigation.  In October 2007, while traveling to a law firm meeting in London with Tracey, more than a year after Marty's last testimony before the SEC, he was unexpectedly indicted in that case.

During the same time period, Marty's aging parents became increasingly ill themselves, and Marty and Tracey were deeply involved in supervising and caring for Marty's father and mother in their final years, including bringing Marty's mother into their home

A number of letters from family members note Marty's devotion to his parents and his decision to bring them into his home in their waning years.  *See, e.g.,* Roberta L.

Goodman-Rosenberg letter, Tab C ("Martin further demonstrated his love and devotion to his parents when he and his caring wife Tracey brought his mother (my aunt) to live with them after the death of Martin's father."); Lauren Balberg letter, Tab C ("Family has also been important to Martin. When my uncle passed away Martin and his wife, Tracey, brought my aunt into their home."); Barbara Klein letter, Tab C ("During his parent's final days, Marty made sure his parents were well cared for. To assure giving them the best care possible, Marty moved them into his home.") Barbara Klein letter, Tab C.

Tracey also loved Marty's mother deeply and bore day to day responsibility for her care,

. Marty's mother quietly passed away in April 2007 at the family home in Westchester with Tracey and Marty at her side in the bedroom they had made for her. Marty's pain from that loss remains palpable. Laurence Furic, a close friend from Marty's synagogue, shares how Marty would honor the memories of his parents with great feeling and emotion:

> Martin's parents have both deceased, and there are memorial plaques in our sanctuary recalling their names and lives. I have always noticed how respectfully and lovingly Martin's eyes gaze at those plaques, also making sure that they will be lit at the proper period on the anniversary of their passing. Last Mother's Day, Martin Weisberg, who attends the same biblical study class on Sunday mornings as I do, arrived late at class, and he told me that he had visited his mother. I knew that he meant he had visited the cemetery, but his language had an accent of such tender love for his mother that I had the chills and felt like he had actually hugged her to thank her for being a mom.

*See* Laurence Furic letter, Tab F.

After Marty's mother's passing, Tracey, relieved of the routine of focusing on her mother-in-law's day-to-day care, found herself at a crossroads.

Tracey's sisters live in New Mexico and

REDACTED

were available to assist her with the two young children on a regular basis

At the same time, Tracey's parents were aged and infirm themselves and would benefit from her supervision of their care in New Mexico.

These realities led the family to make the difficult and painful decision that Tracey would go back home to live in New Mexico with         and       where Tracey would have the emotional and physical support of her sisters and nieces, who were young adults.  Marty's law practice, professional contacts and ability to make a living required him to remain in New York, so he reluctantly accepted and supported her decision.

As a result, over the past almost six years and throughout the course of these legal proceedings, Marty has been separated from his family for large portions of the year, living alone in their Westchester home, trying to preserve his legal practice. He visits with his wife and children during school vacations, holidays and summers in an effort to remain as involved and connected to Tracey and the children as he can.  Tracey has struggled as the only parent continuously present in the home, maintaining her stability with distance from these proceedings and the support of her sisters.  She describes in her letter how Marty continued to be involved with the children despite the distance:

> I appreciated that Marty respected my need
> both for myself and the children, to be in New Mexico during this time
> despite the added stress the distance put on him.  Marty has continued to be
> a committed and active father to our children throughout this time, although
> much more has taken place by telephone between our school vacations and
> summers together than we would have preferred.

Tracey Weisberg letter, Tab B at p. 7.

Throughout this time, Marty and Tracey have continued to make joint decisions as families do, and as discussed *infra,*

7

REDACTED

## 2.   Defendant's Children

As reflected in the Pre-Sentence Report ("PSR"), despite being in their 60s, the defendant and his wife have two young teenage children

### a.   Defendant's Son

REDACTED

REDACTED

REDACTED

REDACTED

    b.     **Defendant's Daughter**

Marty's availability to be physically present with       as well as     is critically

important, as described by close relatives in their letters to the Court.

> These kids, like all teenagers, will be a very great challenge for Tracey to raise without the assistance of Marty, if he is not allowed to join her in that endeavor. The next few years are a crucial time for their development.

*See* Stanley Low letter, Tab J.   Similarly, Tracey's sister Annie Low, who has been an

elementary school teacher for many years writes:

> The children,     and    are now young teenagers and need the guidance and assistance of both parents together more than ever. As an example, the opportunity for daily interaction and the awareness that both Mom and Dad are fully available for assistance, homework help and discipline are important reasons for Marty's continued presence.

> Additionally, having Marty available to celebrate the many successes and milestones that come along with having young teens will also benefit    and    and help bolster self-confidence. Marty will provide the necessary guidance and support that Tracey and the children need upon rejoining them after this long difficult road.

*See* Annie Low letter, Tab J.

### 3.    Faith and Commitment to Synagogue

Marty's religious faith has always been important to him, and during the pendency of these cases, he has greatly relied on his synagogue for support and community. Rabbi Carla Freedman of Jewish Family Congregation, Marty's synagogue in South Salem, New York, writes about Marty's commitment to the temple community and leadership role on the Ritual Committee and describes Marty as:

> ...a regular participant in our weekly Sabbath worship services, and also in our weekly Torah study group, which meets on Sunday mornings. He is also an active member of our Ritual Committee, which oversees the religious life of the congregation. As I have gotten to know Martin better over the past few years, I have come to appreciate the warm, caring and thoughtful person he is. I know him to be dedicated to his children's well-being, even though they live most of the time in New Mexico with their mother, and he makes a point of speaking with them daily and visiting as frequently as he can manage. I also know that Martin is respected and trusted by our community. He is certainly a man of great integrity and responsibility, both of which derive from his family background and his religious principles.

*See* Rabbi Carla Freedman letter, Tab F.

A number of members of the congregation have submitted letters describing Marty's commitment to the religious vigor and cohesion of the temple community. *See* Tab F. Alice Gottlieb shares Marty's contributions to the religious life at the synagogue and kindness demonstrated toward other congregants, including her disabled mother.

> Marty serves the congregation in many key areas and has always shown the highest degree of integrity, volunteerism and commitment. As a member of the Ritual committee he must ensure that Jewish law is observed correctly at services and other synagogue functions....The absence of Marty Weisberg will have many deleterious impacts. The synagogue may well split apart without his moderating and thoughtful influence. Clearly the day to day function of the Ritual Committee will be severely impacted. He listens when I discuss personal problems, he helps my disabled mother in the synagogue and walking to the car and he always greets me with a warm look

13

and kind words.  Finally, I will be bereft of a good friend whom I would trust with the keys to my house, with my children and with my future.

*See* Alice Gottlieb letter, Tab F.

Glenn Kurlander describes how Marty has demonstrated leadership during difficult circumstances at the synagogue:

> The challenges our synagogue faces are sensitive and emotionally charged. The congregation is deeply divided over rabbinical and financial issues. And our special challenges are exacerbated by ones that many synagogues share, such as an aging and declining membership.  As difficult and divisive as these issues have become, Marty has always dealt with them thoughtfully and responsibly.  He has been careful to take into account competing perspectives and has always been respectful of others' feelings and concerns.  He has worked hard to find compromise and it is clear to me that, in all his dealings, his only concern was for the health and well-being of our congregation.  While working to resolve all these challenges, without exception Marty's conduct has exemplified a deep sense of integrity, honesty and ethical behavior.

*See* Glenn Kurlander letter, Tab F.  Marty continues to be generous with his time to address the needs of the synagogue community and has continued to rely on his faith and those community relationships during the extended separation from his family.

**B.    Professional Life**

Marty has practiced law for his entire professional life.  Following his graduation from Northwestern Law School in 1975, Marty joined Cravath, Swain & Moore as an associate. Marty left Cravath in 1980 to join Gelberg & Abrams where he became a partner in the corporate group.  In 1987, he joined Morgan Lewis & Bockius, from which he was recruited to Shea & Gould in 1991.  When Shea & Gould dissolved in 1995, Marty joined Parker Chapin LLP, which subsequently merged with Jenkens & Gilchrist.  He remained there until 2005 until the firm declared bankruptcy, and then joined the corporate group at Baker & McKenzie in the summer of 2005.  Upon his indictment in the PIPEs case, Marty resigned from Baker & McKenzie and

14

continued to service his remaining clients as a solo practitioner, working in office space belonging to a longstanding client, Richard Bernstein.

From the outset of his career, Marty has been a quick study, meticulous in learning his trade, and willing to travel and work around the clock to provide top quality transactional advice to what grew to become a wide array of corporate clients, including well known enterprises like Dick Clark Enterprises, Golden Books and Manischewitz. *See* Tabs K and L. Over the long years of his career, he worked what many (including his wife and friends) would describe as an unhealthy number of hours. His business relationships largely became his social circle, and it thus comes as no surprise that so many of his clients and professional contacts have submitted letters to this Court on his behalf to share their appreciation and respect for Marty's legal acumen, ethical counsel and generous friendship. *See generally* Tab M.

Bernstein who began his career in commercial real estate, went on to acquire companies in the publishing, manufacturing, healthcare and food industries and has used Marty as his chief outside counsel for the past 25 years for a number of major transactions. He describes Marty as a lawyer whose advice was always thoughtful, conservative and of the highest ethical character:

> Never once in all the years [Marty] was my lawyer did anyone ever question his actions and/or advice. He never even came close to the line. In most of our dealings we had other counsel of my choosing and from different law firms for tax and other specialties working on the matters and transactions for which Marty was the lead corporate attorney. Never once did these other lawyers ever question the virtues of his advice and counsel.

*See* Tab N.

Bernstein is just one of many of Marty's clients who remained confident in Marty's competent and ethical counsel despite the indictments, and who continued to rely on Marty for sophisticated legal advice during the pendency of these proceedings. Kari Clark, the wife of the late Dick Clark, describes how her husband considered Marty his chief legal advisor over the

15

many decades Clark's television and radio persona became a household name in American homes everywhere.

> Marty Weisberg was my husband's attorney for almost 30 years. Dick turned to Marty for his counsel, advice and judgment on numerous projects, transactions and other matters. We have always respected his opinions. Over the years, Marty has guided us through most of Dick's business endeavors, including the television production business, his radio programs, his hosting agreements and personal appointments, a cable television business, owning and operating restaurants, real estate transactions, tour promotion, an event business and others.

*See* Kari Clark letter, Tab O.

Similarly, Alfred Sklar, a former U.S. defense laboratory scientist with a top security clearance who serves as a senior officer of a conglomerate of international power businesses, shares his high respect for Marty's integrity and prowess as the outside general counsel for his businesses for many years. *See* Alfred Sklar letter, Tab P. ("[Marty's] legal advice to our firms has contributed to a great part of our success and our future is diminished without Martin to represent us legally. We took great pride in our association with Martin. . . ")

But not all of Marty's clients were high profile or well established. He provided the same high quality, meticulous legal advice to all of his clients - large or small, patiently sharing his business acumen and experience with less sophisticated clients. Haig Keledjian describes how Marty provided invaluable advice to his start-up bio-tech company, Viral Genetics, Inc.:

> While we never could really afford him, Marty nevertheless took the time to learn about our company and to get to know me personally, and provided advice to us that gave me tremendous comfort in navigating the challenging world of fund-raising and operating a small, development-stage public company. Marty was always available when we needed him, morning, noon, and night. He was tireless.

*See* Haig Keledjian Letter Tab Q.

Similarly, Lydia Bach shares how Marty's legal savvy helped her protect her life's work by negotiating a deal to trademark her fitness method and give her peace of mind:

> It was said, [Marty] believes <u>everybody counts or nobody counts</u>. Well, I was low on the totem pole compared to his multi-nat'l corp [sic] clients and well-known billionaires. But he lived up to his reputation of giving his all equally.
>
> He became the lawyer with a heart for all of us, he was never about money. What he wanted was to make a difference in the lives of his clients.

*See* Lydia Bach letter, Tab Q.

Having poured his heart and soul into his career for over three decades, the loss of his license to practice law has been devastating to Marty. Many of Marty's longstanding colleagues and clients struggle to reconcile his conduct in these matters with the integrity they have observed in their own dealings with Marty over many years. *See, e.g.,* James Cohen letter, Tab R, ("On both a personal and professional level, I have always found Marty's character to be above reproach. I believe the acts to which he pled guilty to be completely inconsistent with the Marty I know."); Peter Benz letter, Tab R ("I do not know the Martin Weisberg who pled guilty to these crimes: I can only surmise that it is an aberration"); Larry Usdin letter, Tab R ("Knowing Marty for close to 25 years, it is hard for me to understand that he could have engaged in the actions to which he has pled guilty.") Jonathan Hoffman, who served as co-counsel with Marty on a number of client matters, sums up Marty's professionalism:

> Marty is clearly one of the best, most diligent and hardest lawyers [sic] I have had the pleasure of working with. The knowledge and judgment that he brings from more than thirty-seven years of practicing corporate law is evident in all of the matters that we have worked on together. Marty always, comports himself professionally and treats all parties with the utmost respect and dignity no matter how contentious the issue may be between our client and the other parties. In all of the matters that we have worked on together, Marty has acted ethically and has always displayed the desire to make certain that our client's activities comply with all applicable laws and regulations. Simply put, from my perspective Marty is a consummate lawyer.

REDACTED

See Jonathan Hoffman letter, Tab R.

Indeed, as discussed in the following section,

his loss of his law license as a

consequence of conviction is, alone, a severe punishment for him.

## C.    Loss of Law License

Marty's commitment to his law career has been unwavering since he graduated at the top

of his class from Northwestern Law School in 1975.   Marty spent the last three decades of his

life almost singularly focused on developing a top echelon corporate law practice, which he did.

Described by friends and family as a workaholic, he committed long hours at great personal

sacrifice to develop transactional expertise and longstanding relationships with clients who

remain loyal to him despite his serious missteps in these cases. Thomas Constance, Chairman of

New York law firm Kramer Levin Naftalis & Frankel and former Chairman of Shea & Gould,

sums up Marty's career as a top performing lawyer quite aptly:

> I have known Marty for the past twenty-three years, and in that time
> we have developed a close personal and professional relationship.  In
> this time he has demonstrated himself to be a thoroughly good and
> upstanding human being.  I worked with him on many matters and he
> was always focused, honorable, and hard-working.

*See* Thomas Constance letter, Tab S; *see also* Jeffrey Epstein letter, Tab S ("Over a

period of nine years, my client and myself came to trust [Marty's] word.  We were

never disappointed.")

It is because of this successful career that Marty has been so shattered by these charges

and the conduct for which he has accepted responsibility.  His reputation has been irreparably

tarnished, and he will live the rest of his life with the shame his actions have brought upon him

and his family, and the stigma of being a convicted felon.  Marty surrendered his law license in

August 2012 as a consequence of his guilty pleas, consenting to his removal from the roll of attorneys.  He may no longer practice law; he may no longer take pride in being a member of the Bar.  He stands disgraced before his family, his friends, his profession and the legal community, a community in which he was highly regarded by many.

This would be a serious consequence for any lawyer.

REDACTED

## C.     A Non-Incarceratory Sentence is Warranted

As the Second Circuit explained in *United States v. Jones,* 531 F.3d 163 (2d Cir. 2008), in the wake of *United States v. Booker,* 543 U.S. 220 (2005), the sentencing court is obligated to give fair consideration to the Guidelines before imposing sentence, but "in the end, it must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *Id.* at 170 (citations omitted); *see also United States v. Cavera,* 550 F.3d 180, 188-89 (2d Cir. 2008) (*en banc*).  In conducting this analysis, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Cavera,* 550 F.3d at 189 (footnote omitted).

The defense has submitted objections to the Guidelines calculations in the PSR in a letter dated March 6, 2013, which is attached hereto at Tab A.  Based on those objections, and as set forth therein, the defendant's calculation is that the applicable offense level is 22, and thus the applicable Guidelines range is 41-51 months.  The applicable Guidelines range asserted by the government (but not agreed to by Mr. Weisberg) in the plea agreement in this case is 78-97 months.  But under either of these calculations, the Guidelines will call for an inappropriately and unreasonably high sentence.  Indeed, both the government and the defense recognize that a Guidelines sentence is not appropriate in this case.  Pursuant to the plea agreement and understandings related thereto, the government has agreed not to seek a sentence within the applicable Sentencing Guidelines range and instead to seek only "a period of incarceration," without requesting a specific term of imprisonment.  *See* Plea Transcript, dated May 21, 2012, at p.18, lines 11-25, and p. 19, lines 1-12, annexed hereto at Tab U.  The Sentencing Guidelines are merely advisory even in an ordinary case.  *Booker v. Washington,* 543 U.S. 220, 264 (2005); *see Kimbrough v. United States,* 552 U.S. 85, 101 (2007).  Here, where the government has expressly agreed <u>not</u> to seek a Guidelines sentence, this Court need not – and should not – use the Guidelines as a starting point in considering the appropriate sentence to impose.

Accordingly, even though the parties dispute the Guidelines range applicable to this case, this Court need not resolve those legal or factual issues.  If this Court concludes, as we urge, that determining which Guidelines range applies will not have an effect on the ultimate sentence to be justly imposed in this matter, the Second Circuit has repeatedly made clear that the Court need not determine the specific Guidelines range that would have applied.  *See, e.g., United States v. Antonio-Genan,* 363 Fed. Appx. 78, 79 (2d Cir. 2010) (dismissing defendant's appeal of sentence where court imposed non-Guidelines sentence and made clear it "would have imposed

the same sentence regardless of its ultimate Sentencing Guidelines range calculation."); *United States v. Dhafir,* 577 F.3d 411, 415 (2d Cir. 2009) ("We reiterate here that the district court is not bound in ambiguous circumstances such as these to choose one Guidelines range in particular, and is free to take the more flexible – and often, more direct – approach of arriving at a more appropriate sentence outside the Guidelines."); *United States v. Pike,* 292 Fed. Appx. 108, *3 (2d Cir. 2008) (finding that district court was not obligated to resolve dispute regarding adjustments to defendant's offense level where adjustment was irrelevant to sentence); *United States v. Crosby,* 419 F.3d 103, 112 (judge need not resolve all factual issues "if the judge has fairly decided to impose a non-Guidelines sentence."), *abrogated on other grounds by United States v. Lake,* 419 F.3d 111 (2d Cir. 2005); *United States v. Shuster,* 331 F.3d 294, 297 (2d Cir. 2003) (challenge to applicable criminal history category need not be adjudicated where same below-Guidelines sentence would have been imposed "even if [the court] started from a higher level."). *Id.*

Because neither party seeks a Guidelines sentence here, we respectfully suggest that it is not necessary for the Court to conduct a *Fatico* hearing or otherwise resolve the factual disputes between the parties before sentencing. Nevertheless, to the extent the Guidelines calculations set forth in the PSR are unjustified, the defense sets forth its objections to certain enhancements below.

### 1.    SIAM Case

Pursuant to his guilty plea, Marty accepted responsibility for having converted funds in the SIAM escrow account for his personal benefit without the clients' knowledge at the time of the transfers. It is important for the Court to recognize, however, that Marty long ago made full restitution of these funds, together with the interest that would have accrued had the funds not

been converted for his use.  Marty paid a rate of interest agreed to and accepted by SIAM.  *See* JPMorgan Chase and Citibank records, Tab V.  Indeed, he made full and complete restitution by the 2007 year-end, over ten months before the indictment was returned in the escrow case.  The victims were thus made whole well before the charges were brought in this case, and there remains no financial harm that must be rectified from this offense.

### 2.   PIPEs Case

Similarly, in connection with the PIPEs indictment, Marty accepted responsibility for his actions in participating in the filing of certain disclosure documents with the Securities and Exchange Commission that did not accurately describe specific aspects of PIPEs transactions.[2] He agreed to pay a $250,000 in forfeiture, and paid that amount in full within weeks of his guilty plea.  A number of factors weigh in favor of lenience in sentencing in connection with the PIPEs case.

The Court should take into consideration the disposition of the PIPEs case with respect to Marty's co-defendants, none of whom have been sentenced to prison.  This Court sentenced Zev Saltsman, who pleaded guilty in March 2010, and whom the government claimed to have been the primary orchestrator and financial beneficiary of the activities, to a probationary sentence of three years and 2000 hours of community service.

---

[2]  The PSR's factual description of the offense conduct related to the PIPEs case is inaccurate in many critical respects, and presents a highly exaggerated picture of the actual conduct in that case and that goes far beyond the conduct to which Mr. Weisberg pleaded guilty. The PSR includes allegations that are contradicted by information the government obtained during its investigation, and factual assertions that this Court previously declined to adopt in the course of sentencing the lead defendant in this case, Zev Saltsman.  Marty continues to assert his objections to the inaccurate factual assertions in the PSR, which are set forth in detail in his March 6, 2013 Objection letter and will not be reiterated here.  We ask the Court to review our March 6, 2013 Objection Letter, annexed hereto at Tab A, to counter the misimpression created by the inclusion of this material in the PSR.

23

The government entered into deferred prosecution agreements with Marty's other co-defendants, Steven and Edward Newman, based, in part, on their respective medical conditions. Thus, the charges against the Newmans were dismissed by this Court on September 5, 2012.[3]

"The need to avoid unwarranted sentence disparities" among similarly situated defendants is one of the factors sentencing judges are required to consider pursuant to 18 U.S.C. §3553(a) (6). It is thus entirely appropriate for a sentencing court to "compare co-defendants' sentences to avoid unwarranted sentencing disparities." *United States v. Menendez*, 600 F.3d 263 (2d Cir. 2010); see also *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007), abrogated on other grounds, *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (en banc). The disposition of the charges against Saltsman and the Newmans should be taken into account when this Court imposes sentence upon Marty.

Indeed, even with respect to Saltsman, who was claimed to have orchestrated the scheme and personally reaped significant profits, the government acknowledged that the $55 million loss amount set forth in the PSR was inappropriate, and agreed with Saltsman that the appropriate loss range was $200,000 to $400,000, pursuant to 2B1.1(b)(1)(G). At Saltsman's sentencing, the Court rejected the PSR's loss calculation and accepted the lower calculation. That the government permitted Saltsman to plead guilty to a more narrow securities fraud offense that encompassed only one PIPE transaction, rather than the broader alleged conspiracy, is not relevant for sentencing purposes[4] and should not result in a disparity between co-defendants in

---

[3] Steven Newman also agreed to forfeit $200,000 plus an additional $229,100.88 in previously seized funds, and Edward Newman agreed to forfeit $100,000. Both Newmans also agreed to lifetime bars from serving as an officer or director of a publicly traded company. Marty expects to be subject to similar consequences upon completion of negotiations with the SEC to resolve its case against him.

[4] See Sentencing Guidelines § 1B1.3 (Relevant Conduct); Application Note 1& Background ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.")

24

REDACTED

the sentence imposed, based on any higher "loss amount" asserted by the government here for the same alleged course of conduct.[5]

### c.   No Fine is Warranted

Marty agreed to a $250,000 forfeiture in the plea agreement, and paid the amount in full within weeks of his guilty plea. No additional fine or restitution should be ordered beyond that amount. While Marty and his wife have assets that have been accumulated over decades of hard work in their respective careers, they will have limited ability to generate income going forward as a result of Marty's conviction and surrender of his law license. Because Marty and Tracey are older parents

### D.   Acceptance of Responsibility

Marty's guilty pleas to one count in each indictment represents full acceptance of responsibility for his criminal conduct. Marty's guilty plea in the PIPES case resolved an anticipated 8-10 week trial before this Court many months before the scheduled trial date. Marty entered his plea in the escrow case before jury selection or trial had commenced as well. Marty's

---

[5] Indeed, even if the government is not formally estopped from claiming a higher loss amount here than it did for Saltsman (*see United States. v. Gushlak*, 2011 WL 128359 (E.D.N.Y. 2011) (Garaufis, J.)), such inconsistency in position with respect to codefendants is highly disfavored and contrary to the government's own policies. Thus, the United States Attorney's Manual ("USAM") prohibited government attorneys from agreeing in Saltsman's case to facts that do not "accurately reflect the defendant's conduct," and from not disclosing to the Court and Probation Department the full set of facts relevant to sentencing. USAM 9-15.300; *see also* U.S.S.G. § 6B 1.4(a)(2) & § 6B 1.4 (commentary). *See generally United States. v. Panduro*, 152 F. Supp. 2d 398, 405-06 (S.D.N.Y. 2001) (absent the discovery of new facts, the government may not seek to apply a higher quantity of narcotics than amount used in plea agreement of a similarly situated co-defendant, where as here "[t]here appears to be no principled reason [to do so] except for the vagaries of the plea bargaining process. . ."; noting that a co-defendant's "plea agreement is presumed to [be] based upon a reasonable interpretation of the relevant facts."), *aff'd* 38 Fed. Appx. 36 (2d Cir. 2002).

acceptance of responsibility before a trial was conducted in either case saved substantial time and resources.  Within a few weeks of his pleas last May, Marty forfeited an additional $250,000 to the government to recompense the loss in the PIPEs matter.

In addition to resolving the criminal cases without trial, the defendant on his own initiative promptly surrendered his law license following his pleas, authorizing his counsel to submit an affidavit to the First Judicial Department, dated August 8, 2012, consenting to the surrender of his law license and committing "to take whatever proactive steps he can to have his name stricken from the roll of attorneys as quickly as possible." *See* Michael Ross affidavit, Tab W.

## E.   The Purposes of Sentencing Can Be Vindicated Through a Non-Guidelines Sentence

Section 3553(a) directs courts to impose the <u>minimum</u> sentence necessary (a) "to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense;" (b) "to afford adequate deterrence to criminal conduct;" (c) "to protect the public from further crimes of the defendant;" and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[6]  18 U.S.C. § 3553(a); *see also United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher [one]").

In addition to these mandatory factors, section 3553 also directs the Court to consider, among other factors, "the history and characteristics of the defendant," "the kinds of sentences

---

[6]Given Marty's education and professional background, the final factor that focuses on rehabilitation is inapplicable.  Moreover, Congress has expressly stated that "imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

available," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Where, as here, "the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the [section 3553(a) considerations], as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *United States v. Adelson,* 441 F.Supp.2d, 506, 515 (S.D.N.Y. 2006). As described *supra* and set forth below, incarcerating Marty Weisberg is not necessary to vindicate the relevant section 3553 factors.

### 1.    Marty's Extraordinary Family Circumstances

Sentences below the otherwise applicable guidelines range are warranted for extraordinarily troubled family circumstances        *See United States v. Hernandez,* 2005 WL 1330764, *5 (S.D.N.Y. 2005) (departure permissible and sentence of time served appropriate under 3553(a)

; *United States v. Gamez,* 1 F.Supp.2d 176, 184-85 (E.D.N.Y. 1998)

, *United States v. Haversat,* 22 F.3d 790, 797-98 (8th Cir. 1994)

As the letters from doctors and the discussion *supra* make clear,

REDACTED

The children are at a crucial juncture in their lives where the active presence of their father is essential.  In imposing sentence, we ask the Court to consider the critical need for Marty to be able to be physically present for his wife and children.

2.    **Collateral Impact of Conviction - Loss of Law License**

The Second Circuit has recognized that the collateral consequences of a conviction may warrant a sentence below the guidelines range.  *E.g., United States v. Restrepo,* 999 F.2d 640, 644 (2d Cir. 1993); *see also United States v. Jones,* 158 F.3d 492, 498 (10th Cir. 1998) ("the impact of incarceration on [defendant's] prospects for future employment" warranted departure); *Redemann,* 295 F.Supp.2d at 897 ("defendant suffered punishment, loss and hardship beyond

REDACTED

that which is usually seen or which can be expected in similar cases."). Marty is devastated by the loss of his license to practice law and the end of the once successful career he developed over three decades.

Having held partnerships at some of the top law firms in the country, Marty now finds himself a defendant in this Court pending sentence for his serious lapses of judgment.

The loss of his law license at age 62 after more than three decades of practice is a severe penalty that serves as effective punishment and deterrence for his crimes.

Marty has suffered dramatically from the collateral consequences of his acts in these matters well beyond the criminal sanctions for his conduct.

### 3.    Service to the Community

Marty was raised in a household that strongly emphasized providing *tzedakah,* i.e. charity, to others in the community who are in need, and he has done so throughout his life. Marty has been providing *pro bono* legal counsel for decades to immigrants, struggling artists, and small entrepreneurs seeking to pursue their dreams and better their lives.

As described in letters from some of the beneficiaries of Marty's assistance, over many years Marty has generously provided legal advice, business guidance and friendship to people from a variety of backgrounds who found themselves in difficult professional and personal circumstances on top of all the hours he devoted to his paid law practice. *See generally* Tab X.

These *pro bono* clients and friends provide authentic assessments of Marty's character and values, demonstrating the aberrational nature of the conduct that brought him to this Court.

These letters speak to how Marty has used his acumen to assist the less privileged and those in need of legal counsel and guidance over the course of his life. Ana Margarita Llobera describes how Marty provided years of counsel, legal advice and compassion to her aunt and uncle as they navigated legal and financial issues involving illness, housing and hospitalizations.

> As I mentioned, Marty has not only been our lawyer, but has become a trusted advisor to us on financial and other family matters. Marty has done this with the most compassion and caring for my elderly aunt. Not only has Marty put all his knowledge into assisting us, but he has refused to charge us for his time in doing so...
>
> When I have asked Marty why he has bestowed so much generosity upon my family, he has told me that he sees his grandparents who came into this country from Russia and Poland in my deceased uncle and aunt. He understands the struggles of immigrants and how perplexing the laws and standards of a new Country might me to them. In sum, Marty is a very compassionate, caring and loving person.

*See* Ana Margarita Llobera letter, Tab X.

Similarly, Yanru Zhou shares Marty's generosity in providing legal counsel to recent new immigrants and entrepreneurs at no charge:

> Mr. Weisberg took a keen interest in helping me adapt to American ways and business....At times I have asked Mr. Weisberg to help some friends, who like myself, are new immigrants like me trying to assimilate themselves faster to the new society. Mr. Weisberg had also become a mentor and legal advisor for some of these individuals and minority small business entrepreneurs who are in need of legal advice, but financially cannot afford it. He has spent much time listening and providing them with legal and business advice and assistance.

*See* Yanru Zhou, Tab X.

Janet and Ramcharran Ramlagan, naturalized citizens who take pride in their oldest son's many awards as a U.S. Marine, explain how Marty has been a role model and mentor to their children:

> Marty is a true friend and mentor to our sons. He is a good human being, who is always willing to lend a helping hand and give some positive advice....Marty came from very humble beginnings. His career is one of the things he has worked very hard for in life. I am a witness that Marty uses his legal license to help underprivileged individuals without asking for one penny in payment.

*See* Janet and Ramcharran Ramlagan letter, Tab X.

Jon Dowling also expressed appreciation for the generous advice and mentorship Marty has provided to him over many years in his aspirational pursuit of a career as a musician:

> Many attorneys will represent your interests as long as it benefits them in the short term, however few will get personally and emotionally involved to the level that Marty has. . . Throughout the last seven plus years that he has represented me not once has be asked me for a dime, representing me on various music contracts, business plans, investor agreements, publishing agreements and the like.

*See* Jon Dowling letter, Tab X.

Marty has also been a loyal and dedicated friend. Benjamin Cohen, a client and close friend, describes Marty's compassion when Cohen unexpectedly lost his wife.

> Marty has displayed deep compassion and caring to me during the most difficult time of my life. When my wife Rachel suddenly and unexpectedly died, and                                  it was Marty who was there for me almost everyday, talking to me, reconciling me, comforting me, and making me accept that Hashem's (G-d) hand is in all that we experience.

*See* Benjamin Cohen letter, Tab X.

These anecdotes, and others set forth in the accompanying letters, demonstrate a pattern of kindness and generosity of time and expertise over many years, affecting many lives, with no distinction made among friend, client or member of the community. Marty has a deep and

longstanding compassion for community service, which, together with his extraordinary family circumstances and the other harsh collateral consequences of his conviction, warrant a substantial downward adjustment in his sentence. *United States v. Greene,* 249 F.Supp.2d 262 (S.D.N.Y. 2003) (significant downward departure based on a combination of community service and extraordinary family circumstances). He is a man who can and will continue to provide value to others if given the opportunity to move forward to repair his life and address the needs of his wounded family.

**F.     Deterrence**

Even before *Booker,* sentencing judges granted downward departures in cases where a Guidelines sentence was "greater than necessary" to afford adequate deterrence and protect the public from further crimes committed by the defendant. *See, e.g., United States v. Gaind,* 829 F.Supp. 669, 671 (S.D.N.Y. 1993) (effective destruction of defendant's business decreased for foreseeable future the defendant's ability to commit further crimes and constituted a source of both specific and general deterrence).

Like the defendant in *Gaind,* Marty poses no risk of committing future offenses, and incarceration is unnecessary to prevent him from engaging in unlawful activity in the future. Marty is 62 years old and has no prior criminal record. Since his conviction, he has surrendered his license to practice law, the only occupation in which he has ever engaged. In sentencing Marty, this Court should consider that in the future he will not, and as a practical matter cannot, engage in the type of work that led to his conviction in this case. *See United States v. Stewart,* 590 F.3d. 93, 140-141 (2d Cir. 2009) (district court appropriately considered fact that defendant will not be able to practice his profession in concluding that "the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial

32

punishment on the defendant,'" and it was not error for district court to consider fact that defendant will not be in position to commit offense again in evaluating "the extent of punishment 'necessary to deter [him] from engaging in future criminal conduct or to protect the public from his future criminal acts.'"). The loss of his license and career is ample deterrence – specifically and generally - for Marty's crimes.

Specifically as to general deterrence, Marty will forever bear the stigma of being a convicted felon. The deterrent effect of that stigma on other lawyers cannot be overstated. Indeed, the impact of a criminal conviction is especially severe for someone like Marty who spent a lifetime in a professional community where he was expected to advise on and uphold the law. *See United States v. Yeaman,* 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes" (citation omitted); Jayne W. Barnard, Reintegrative Shaming In Corporate Sentencing, 72 S.Cal.L.Rev. 959, 967 (May 1999) ("A number of recent studies have suggested that, especially for top-level managers and members of their social class, fear of being shamed before their family members and peers may even exceed the fear of criminal prosecution, exposure to civil lawsuits, or other forms of officially imposed sanctions."). A felony conviction and the loss of his license to practice law sends a very serious message that instances of misconduct as a lawyer can and will destroy an otherwise respectable career built over decades.

### G.    Sentencing Recommendation

We do not lightly ask the Court to impose a non-incarceratory sentence. However, as explained above and in the many letters from family, friends, clients and colleagues accompanying this submission, a prison sentence would have a devastating impact on Marty's

REDACTED

children and his ⌐ wife at this critical time in their lives.  Marty has lost a prominent legal

career established over three decades as a result of his conduct.  Marty has accepted

responsibility for his crimes, and he needs now to be able to be physically present for his son and

his family.  Under all of the circumstances, we ask this Court to sentence Marty to a term of

probation.

Respectfully submitted,

George A. Stamboulidis
Lauren Resnick
Essence Liburd
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Elkan Abramowitz
Richard F. Albert
Morvillo Abramowitz Grand Iason
& Anello, P.C.
565 Fifth Avenue
New York, New York 10017

Enclosures

cc:    AUSA Ilene Jaroslaw
       AUSA John Nowak

ND: 4831-1213-4931, v. 1