DANIEL J. HURSON
LAW OFFICES OF DANIEL J. HURSON, LLC
1997 Annapolis Exchange Parkway, Suite 300
Annapolis, MD 21401
Phone 410-956-8104 Fax 443-458-5628
dan@hursonlaw.com
www.hursonlaw.com

Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
202 Federal Plaza
West Wing, 2nd Floor
Central Islip, N.Y. 11722-9012

April 9, 2013

Re: *United States v. Martin Weisberg*, 07-CR-641 (S-2)(NGG)

Dear Judge Garaufis:

I write to you in my capacity as Special Litigation Counsel to Xybernaut and the steering committee of the Xybernaut Litigation Fund (the "Fund").[1] Xybernaut was a victim in a securities fraud conspiracy to which the company's former outside counsel and director, Martin Weisberg, has now pled guilty and is soon to be sentenced. Xybernaut is a victim of a specific part of that conspiracy described by Mr. Weisberg in his allocution at the taking of his plea.

Mr. Weisberg pled guilty on May 21, 2012 to a count of conspiracy to commit securities fraud in connection with his role as Xybernaut's counsel and director. Mr. Weisberg acknowledged at that proceeding the following:

---

[1] This Fund was established under the terms of the Amended Joint Plan of Reorganization of Xybernaut, Case No. 05-12801, confirmed by the U.S. Bankruptcy Court for the Eastern District of Virginia on Dec. 5, 2006 (the "Plan"). The Litigation Steering Committee of the Fund, as established by the Plan, is composed of representatives of all stakeholders in the Xybernaut bankruptcy estate, including creditors, shareholders, and other claimants. It is the designated entity empowered under Section 5.2 of the bankruptcy plan to pursue any claims against third parties, including Mr. Weisberg, which these stakeholders of the reorganized debtor Xybernaut and its estate may posses. Under the terms of the Plan, Xybernaut Corporation itself has no interest in the Fund, but rather represents the interest of the stakeholders in the Fund in maximizing the value of the Xybernaut estate for the benefit of those participants in the Fund.

In furtherance of this conspiracy in 2004, I agreed, with other individuals, that part of the share price discount for certain Xybernaut shares would be paid [by Xybernaut] to a third-party company as a so-called finders fee.

In fact, there was no finder and a so-called finders fee was just paid to the individuals associated with the investment entity. So it was, effectively, an additional discount. I knew that this false finders fee explanation would be included in disclosure documents filed with the SEC. (Tr. p. 33).

Xybernaut thus thought it was paying a third-party broker who had procured the investor in the company. But there were no such brokers. This fee simply went to Mr. Saltsman as additional compensation for his own investments in Xybernaut, which were hidden by the use nominees as set forth in the indictment. The entity that Mr. Saltzman and Mr. Weisberg used to have Xybernaut pay this bogus "finders fee" was called Tall Spruce. Xybernaut paid $297,500 to that entity (see Agreement Ex. A). Saltzman also admitted these same facts at his plea proceeding on March 11, 2010 (Transcript p. 23-24). Had the independent directors of Xybernaut been aware of these facts, they would not have authorized payment of this fee.

Mr. Weisberg, who had fiduciary duties to Xybernaut as both outside director and outside securities counsel, has now admitted his direct involvement in this transaction in which Xybernaut made the payment and was clearly the victim. On this basis, we submit that Xybernaut is entitled to return of this finder's fee. Thus, Xybernaut requests that it should receive the $250,000 forfeited by Mr. Weisberg in this case.

I also include an Affidavit by James A. Coyne filed earlier in this case in connection with the sentencing of Mr. Zev Saltsman which describes in more detail the damages caused by the conspiracy to which Mr. Weisberg has now pled guilty.

Sincerely,

Daniel J. Hurson

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA

    -against-                                           Criminal No. 07-641 (S 1) (NGG)

ZEV SALTSMAN,

                    Defendant

------------------------------------------------------------X

### AFFIDAVIT OF JAMES A. COYNE REGARDING DAMAGES CAUSED TO CRIME VICTIM XYBERNAUT

       James A. Coyne hereby files this Affidavit on behalf of Xybernaut Corporation regarding the damages caused to Xybernaut by the illegal acts of defendant Zev Saltsman. The Affiant states as follows:

1.     I am a duly-appointed representative of the Xybernaut Litigation Fund (the "Fund") established under the terms of the Amended Joint Plan of Reorganization of Xybernaut, Case No. 05-12801, confirmed by the U.S. Bankruptcy Court for the Eastern District of Virginia on Dec. 5, 2006 (the "Plan"). As such, I am authorized by the Fund to speak on behalf of Xybernaut as a victim of the crimes committed by Zev Saltsman ("Saltsman") against the company. The Litigation Steering Committee of the Fund, as established by the Plan, is composed of representatives of all stakeholders in the Xybernaut bankruptcy estate, including creditors, shareholders, and other claimants. It is the designated entity empowered under Section 5.2 of the bankruptcy plan to pursue any claims against third parties, including Saltsman, which these stakeholders of the reorganized debtor Xybernaut and its estate may posses.

1

2. In this Affidavit, I will first describe Xybernaut and its operations, discuss the role of Saltsman in defrauding and ultimately destroying the company, and then describe the damages caused to Xybernaut by Saltsman's actions.

3. Xybernaut Corporation was a Delaware public corporation, established in the 1990's and based in Virginia, which produced and marketed wearable computers and related software. Xybernaut stock was traded on NASDAQ. Following the announcement on April 1, 2005 of an internal investigation and an SEC investigation regarding its PIPE financings, and the company's inability to file its 2004 form 10K, the company's stock declined in value rapidly and was delisted by NASDAQ in May 2005. Without the ability to finance its operations, Xybernaut filed for bankruptcy on July 25, 2005.

4. During its existence, Xybernaut took on little debt but rather financed its operations through the periodic issuance of stock. It utilized a method of financing known as a PIPE (for Private Investment in Public Equity). A PIPE transaction involved the purchase by an investor of a sizeable block of unregistered stock from the company, following which the company would seek to register the shares with the SEC so they could be sold on the open market. A registration statement was required to be filed with and approved by the SEC before the stock could be sold into the market. Typically, the PIPE investor would be allowed to purchase the stock at a significant discount to the then-prevailing market price of the stock. To comply with SEC rules, the PIPE investors had to identify their "control persons" and had to disclose their interests if they controlled more than 5% of the outstanding stock.

2

5. The Indictment and the SEC Complaint in this case set forth in detail the corrupt scheme that Saltsman orchestrated over a number of years to defraud Xybernaut. Paragraph 19 of the Indictment refers to some *$39 million in profits* in trades of Xybernaut shares generated by Saltsman from 2001 through 2004. Throughout this period, Saltsman and his co-defendants "consistently failed to make required disclosures in [Xybernaut] SEC filings." (Par. 21).

6. The Indictment alleges that between 2001 and 2004, Xybernaut executed 14 PIPE transactions with at least 21 "Nominee Entities controlled by" defendant Saltsman. These entities obtained some 127 million shares of Xybernaut stock at substantial discounts to market prices. (Par. 44). Between August 2003 and February 2004 Saltsman secretly paid $2.4 million in kickbacks to Xybernaut's President Steve Newman and $1.7 million to Xybernaut outside securities counsel and director Martin Weisberg (Par. 51). "These kickbacks represented compensation to defendants Steve Newman and Martin Weisberg for…causing Xybernaut to enter into several PIPE transactions with the Nominee Entities." (Par. 51). These payments should have been, but were not, disclosed as management compensation, nor were they disclosed as compensation to a Xybernaut director and outside counsel. (Par. 52).

7. Saltsman also repeatedly failed to file required disclosures showing his control of more than 5% of Xybernaut's shares. On a number of occasions the extent of Saltsman's control exceeded 10% of the shares (Par. 56). The SEC complaint alleges that between June 2001 and December 2004 Saltsman invested $67 million in PIPE transactions with Xybernaut and in return received 123 million shares, approximately 85% of the total shares issued during that period and approximately 58% of the total issued and

3

outstanding as of September 30, 2004. During one seven month stretch in 2003, Saltsman received 98% of all shares issued by the company. The original Indictment and SEC Complaint essentially charge that Saltsman secretly controlled Xybernaut for years, while bribing the company's President and counsel with millions in illegally gained stock profits. Xybernaut submits that Saltsman's actions constitute one of the most brazen attempts in memory secretly to control a public company, corrupt its management and counsel, defraud and mislead its independent directors, investors and the SEC, and successfully garner millions in illegal profits. If the company involved had been, for example, Xerox instead of Xybernaut, this case would have been front-page news.

8. In this proceeding, Saltsman has pled guilty to a Superseding Information which alleges, *inter alia*, that he conducted the scheme in 2004 and 2005 through the use of two of those investment entities, Polar Properties Ltd. ("Polar") and Western Ventures Ltd. ("Western"). While the overall scheme alleged in the original indictment went well beyond these two entities, it is instructive to focus on them to understand how Saltsman operated the scheme and profited at the expense of Xybernaut.

9. Polar and Western first invested in Xybernaut in March 2004. At a Xybernaut board meeting of March 11, 2004, the board approved a $5 million investment in Xybernaut by Western, which would purchase the common stock at $1.34 per share, resulting in the issuance of 3,731,343 million shares (a 20% discount to the market price on Feb. 27, 2004). Western would also obtain an equal number of warrants (the right to purchase shares in the future) at the exercise price of $1.52. The second deal (Polar) was a $1 million private placement for 662,252 shares, at $1.51 per share (a 20% discount to

the market price on March 4, 2004), and the issuance of an equal number of warrants at $1.52 per share. After discussion, the board adopted a resolution approving the offerings.

10. Saltsman has now admitted that he secretly controlled both Polar and Western through nominees. The Xybernaut board was never informed of Saltsman's control, nor was it disclosed in the registration statements. These misrepresentations were material breaches of the securities laws and represented a fraud upon Xybernaut. In fact, the board resolution approving the deal included the express stipulation: "Resolved, that in connection with the Private Placement, the Company shall take such actions as are necessary to comply with the requisite federal and state securities laws…" (Board Minutes, Resolution, March 11, 2004).

11. Polar and Western were used a second time by Saltsman in November and December of 2004 to effectuate an $8.5 million investment in Xybernaut. In that deal, Western was to loan Xybernaut $5 million for 30 days, since the company did not have enough authorized stock at that time to do a PIPE deal. The plan was to have the stockholder annual meeting on December 15, 2004 approve the increase in stock, after which the loan would be converted to an equity position with the issuance of stock and warrants. The deal also provided for the repricing of the Polar and Western warrants issued in the previous deal down to an exercise price of $.80 per share. Once again, Saltsman's role as the actual investor was never disclosed to Xybernaut's independent directors, to the shareholders, or to the SEC.

12. After the shareholders meeting approving the issuance of new shares, the $5 million loan was converted to equity and an additional $3.5 million was added. To provide himself with extra profit, Saltsman and his co-conspirators devised a phony

5

finders' fee of 3.5% ($297,500) to be paid by Xybernaut to a straw entity called Tall Spruce Ltd. (Exhibit 1 herein). As the government has alleged and Saltsman has now admitted, this fee was meant for Saltsman personally but was concealed, according to the Information (Par. 7), "because they believed that its public disclosure would cause the price of Xybernaut's stock to fall." Moreover, disclosure of his identity as the real investor would have been of concern to Saltsman since he secretly controlled millions of Xybernaut shares and knew that full disclosure of his control would cause serious issues with the SEC and presumably expose the falsity of prior representations to the board and the SEC in connection with both the March 2004 and pending December 2004 PIPE registrations, as well as numerous earlier PIPE financings he had also secretly controlled.

13.     The December 2004 PIPE deal, as finally structured, involved the issuance of 5,392,580 shares to Western at an approximate 20% discount to market price. Western was also given warrants to purchase an equal number (another 5, 392,580) of shares of the common stock, at an exercise price of $1.16. Polar, the entity allegedly providing the additional $3.5 million, received 3,774,806 shares at the same discounted price Western received, and an equal number of warrants at the same exercise price. Also, to "induce" Polar to make its investment, the purchase price of the warrants provided Polar in the March 2004 deal was reduced from $1.52 to $0.80 cents per share, for 331,126 shares of common stock. Once again, the board, ignorant of the concealed role of Saltsman, passed a resolution approving the deal provided that the company "take such actions as are necessary to comply with requisite federal and state securities laws..." (Board Minutes, Resolution, Dec. 23, 2004).

14.     The value of the 20% discount in the stock price Xybernaut unknowingly provided Saltsman was substantial. Those discounts amounted to over $4,067,480, which only added to the profits Saltsman was making from selling the stock short before announcement of the PIPE deals, as alleged in the original indictment. Also, the substantial reduction in the negotiated price of the March 2004 Polar warrants (provided as part of the December 2004 deal) resulted in an approximate $238,000 discount. Another discounted exercise of warrants by Polar in March 2005 resulted in a further discount of almost $680,000. The total discounts Xybernaut gave to Saltsman through Polar and Western came to $4,985,480. Also, Xybernaut paid the unwarranted finder's fee of $297,500 to Tall Spruce (in reality Saltsman), $17,500 in legal fees to Saltsman's law firm Kreiger & Prager, and an additional financing fee of $192,500 for the initial $5 million loan from Western. *Thus, the damage to Xybernaut directly caused by the transactions underlying the single count to which Saltsman has pled total at least approximately $5,492,980 dollars.*

15.     The criminal and civil investigations which ultimately led to the filing of this case, when initially announced, caused severe damage to Xybernaut. When the NASDAQ delisted the stock of Xybernaut on May 11, 2005, the Panel stated that it had considered certain "relevant facts" in reaching its decision to delist Xybernaut. One such fact stated: "*US Attorney and SEC Investigations.* The company disclosed on April 26, 2005 that it was being investigation by the U.S. Attorney's Office for the Eastern District of Virginia. It also disclosed that it had received a subpoena from the... SEC seeking information relating to the sale of Company securities by persons identified as selling shareholders in a Company registration statement or other public filings." While praising

7

the efforts of the independent directors to save the company, the NASDAQ Panel found that Xybernaut "had few cash resources" to "rebuilt senior management," hire new auditors, and provide complete financial disclosure. It thus delisted the company from the stock exchange, which denied the company the ability to raise operating funds in the capital markets. This inability to continue to finance itself led directly to Xybernaut's bankruptcy just weeks later.

16. While Xybernaut has thus directly incurred almost $5.5 million in damages caused by Saltman's concealment of his control over Polar and Western alone, similar damages can be calculated on all the PIPE transactions done by Saltsman, as they all included substantial discounts to Saltsman on the stock sold by Xybernaut to him under false pretenses. In total, profits gained by Saltsman on Xybernaut stock sales are alleged to be $39 million by the Indictment and SEC complaint. Xybernaut, had it been properly informed of the corrupt scheme, would have rescinded all these deals, or never entered into them in the first place, and would have terminated its corrupt officers and counsel. The illicit profits generated in these fraudulent transactions facilitated by the improper trading in Xybernaut stock constitute damages to Xybernaut.

17. In addition to the damages set forth above, Xybernaut has also been damaged in that the bribes paid by Saltsman to Xybernaut president and director Steve Newman and counsel and director Martin Weisberg, a total of $4.1 million, represented undisclosed compensation and/or overpayments to these individuals that should have gone for the benefit of their client and employer, Xybernaut. Weisberg and Steven Newman should have turned them over to Xybernaut, or Saltsman should have made such payments to Xybernaut as part of his payments for the stock, instead of using the funds to bribe and

8

assist in the breach of fiduciary duties by its officer, director and counsel. I understand from Xybernaut counsel that these funds can be considered damages to Xybernaut under prevailing law. I also understand that under the federal securities laws Xybernaut is entitled to any "short swing profits" that Saltsman made on the purchase and sale of Xybernaut stock while he controlled more than 10% of the company's stock, as is alleged in the SEC complaint (Par. 27, 35) which would presumably be included in the $39 million in profits it is alleged in the Indictment and SEC complaint. that he made on sale of Xybernaut stock

18. The collapse of Xybernaut and its eventual bankruptcy can be directly attributed to the Saltsman's actions, including his repeated failures to disclose the truth to Xybernaut's independent directors, shareholders, and to the SEC. Had proper disclosure been made from the inception of the scheme as charged in the indictment, it is highly likely that Edward and Steve Newman would have been terminated as early as April 2001, when the first fraudulent PIPE transaction occurred. Likewise, Martin Weisberg would have been terminated as outside counsel and director. The corrupt relationship with Saltsman would never have occurred or would have been "nipped in the bud." This relationship was ultimately the undoing of the company, since it allowed corrupt executives to continue in place, as well as a corrupt outside counsel and director, and essentially allowed the company's finances to be hijacked by a single secret investor, Saltsman. When public announcements were eventually made of the SEC and DOJ investigations underlying this case, the stock price collapsed and with it access to the capital markets. The delisting of the company by NASDAQ followed soon thereafter, dooming Xybernaut to bankruptcy.

19. Xybernaut has provided the government expert evidence that the company lost almost $19 million in net asset value between March of 2005, before the announcements of the internal investigation and SEC investigation, and October 11, 2006, when it was purchased by its principal lender. See letters from Xybernaut to the United States Attorney for the Eastern District of New York of October 7, 2009 and November 23, 2009, attached herein as Exhibits 2 and 3.

20. Xybernaut incurred approximately $1.4 million in costs in 2005 associated with its internal investigation and its response to the SEC investigation into the defendants' activities. It is my understanding that such costs recoverable to Xybernaut from Saltsman, see exhibit 2, page 4, Xybernaut letter to USAO of October 7, 2009.

21. In sum, at this time Xybernaut makes the following specific claims for restitution from Mr. Saltsman and seeks an order from this Court for such restitution. It is my understanding that the plea agreement Saltsman has entered may provide for such restitution. In making these claims, Xybernaut does not waive its right to make additional claims, or modify the claims herein based on discovery of additional evidence, in this or other forums:

   a) Value of discounts on stock provided to Saltsman by Xybernaut in the Western and Polar PIPE transactions: $4,985,480;
   b) Funds paid to Saltsman by Xybernaut as a "finder's fee" in the Western/Polar transaction: $297,500;
   c) Additional expenses paid by Xybernaut (legal fees, interest) in connection with the Western/Polar transaction: $210,000 (see Par. 15 above);
   d) Value of bribes paid by Saltsman to Xybernaut officer Steven Newman and Xybernaut counsel and director Martin Weisberg, as alleged by the U.S. Attorney and the SEC: $4.1 million;
   e) Decline in net asset value of Xybernaut following delisting of stock and bankruptcy: $18.9 million;
   f) Profits illicitly made by Saltsman on sale of Xybernaut stock, as alleged by the U.S. Attorney and the SEC: $39 million;
   e) Reimbursement of costs of Xybernaut internal investigation: $1,333,000.

10

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, executed May 31, 2010.

/s/ James A. Coyne