AGREED FACTS – PIPEs CASE
May 6, 2013

Companies and Individuals

1. Ramp Corporation was a corporation organized under the laws of the State of Delaware, the shares of which were publicly traded on the American Stock Exchange. Ramp Corporation maintained its headquarters in New York, New York, and had shareholders throughout the United States. The corporation's business included the development of computer software for use by healthcare providers to record and manage orders of prescription drugs and laboratory tests.

2. Xybernaut Corporation was a corporation organized under the laws of the State of Delaware, the shares of which were publicly traded on the National Association of Securities Dealers Automated Quotation System SmallCap Market (NASDAQ-SCM). Xybernaut Corporation maintained its headquarters in Fairfax, Virginia, and had shareholders throughout the United States. The corporation's business included the development and distribution of portable computer hardware.

3. Granot, Strauss, Adar & Co., was a law firm located in Ramat Gan, Israel.

4. Turks and Caicos First Secretarial, Ltd. was a limited company formed under the laws of the United Kingdom that maintained offices in London, England, and Grand Turk, Turks and Caicos. Turks and Caicos First Secretarial, Ltd. was in the business of establishing and registering corporations in the Turks and Caicos Islands.

5. Pond Equities was a broker dealer, registered with the United States Securities and Exchange Commission, that maintained offices in Brooklyn, New York.

6. Edward Newman held the positions of Chief Executive Officer and Chairman of the Board of Directors at Xybernaut Corporation. Steven Newman is the brother of Edward Newman, and held the position of Vice Chairman of the Board at Xybernaut Corporation. From January 2003 through May 2005, Steven Newman also held the position of President and Chief Operating Officer at Xybernaut Corporation. Zev Saltsman was a resident of Ginot Shomron, Israel. Menachem Eitan was a resident of Karnei Shomron, Israel. **Martin Weisberg** was an attorney practicing law in New York, New York, and was a member of Xybernaut Corporation's Board of Directors. Andrew Brown was a consultant to Ramp Corporation between August 2001 and October 2003, after which he held various positions at Ramp Corporation, including CEO, President and Chief Operating Officer, and became a member of the corporation's Board.

7. Zev Saltsman and Menacham Eitan were associated with the following entities (the "Financing Entities"): Cavell Investments Ltd.; Brookside Financial Ltd.; Pearl Ltd.; Green Meadow Finance Ltd.; Canary Point Ltd.; Sycamore Properties Ltd.; Hilltop Services Ltd.; Cottonwood Ltd.; Willow Bend Management Ltd.; Eva Holding Ltd.; Rema Investments Ltd.; Holly Investments Ltd.; Rambo Investments Ltd.; Chesterfield Ltd.; Essex Ltd.; Sundial Investments Ltd.; Capecove International Ltd.; London Properties Ltd.; Sussex Consulting Ltd.; Volare Overseas Ltd.;

1

AGREED FACTS – PIPEs CASE
May 6, 2013

      Archway Holding Ltd.; Maple Systems Ltd.; Greta Holdings Ltd.; Western Ventures Ltd.; Polar Properties Ltd.; Company Management Ltd.; State Street Corporation; Reno Holdings Ltd.; Yeshuah Investments Ltd.; Rewell Holdings Ltd.; Firewall Universal Ltd.; Sundale Corporation; Dune Holding Ltd.; Hazel Investments Ltd.; Bertrand Overseas, Ltd. Canon Ventures, Ltd.; and Samira Management Ltd. In their dealings with Ramp Corporation and Xybernaut Corporation, Saltsman, Eitan and the Financing Entities were not represented by Mr. Weisberg.

8. The term "private investment in public equity," or "PIPE" transaction, refers to a privately negotiated sale of unregistered securities by a public company to certain accredited institutional and individual investors, usually at a discount to the prevailing market price. The public announcement of a consummated PIPE transaction typically depressed the share price of the company if the PIPE shares were sold at a discount. The rules and regulations of the SEC permitted the PIPE investors to sell shares originally issued in a PIPE transaction after the issuer filed a registration statement for those shares and the SEC declared the registration statement effective.

9. A "short sale" was the sale of a security that the seller did not own, made for the purpose of profiting from a potential decline in the given security's price. The short-seller was generally required to borrow the shares sold in the short sale. Following the sale of the borrowed shares, the short-seller later closed out the short position by returning to the lender an equivalent number of shares of the given security.

10. The term "warrant" referred to a security that may entitle the holder to buy shares of the issuing company at a specified price at some time in the future. An owner of a warrant stood to profit if, on the exercise date of the warrant, the price of the shares was higher than the price at which the owner was entitled to buy the shares pursuant to the warrant.

The Ramp PIPE Transactions

11. Between December 2002 and July 2004, the Ramp Corporation executed ten PIPE transactions and other financial transactions with at least thirteen different Financing Entities. In connection with these PIPE transactions, the Financing Entities obtained approximately 162,000,000 shares of Ramp common stock at substantial discounts to the market price. Andrew Brown negotiated and approved the majority of these PIPE transactions on Ramp's behalf.

12. In the SEC filings for the ten PIPE transactions, Ramp did not disclose whether the Financing Entities were related to one another. In each of these filings, Ramp stated that the relevant Financing Entity was controlled by either an employee of Granot or TCFS. Andrew Brown signed the Form S-3 registration statements filed with the SEC for each of the three PIPE transactions executed between Ramp and the Financing Entities after Brown became Ramp's President and Chief Operating Officer in October 2003. Mr. Weisberg first became involved with Ramp on or

2

AGREED FACTS – PIPEs CASE
May 6, 2013

       about September 23, 2003, when he began representing Ramp in connection with certain PIPE transactions.

The Xybernaut Activities

13. Between April 2001 and December 2004, Xybernaut executed 14 PIPE transactions and several other financial transactions with at least 21 Financing Entities. In connection with these PIPE transactions, the Financing Entities obtained approximately 127,000,000 shares of Xybernaut common stock at substantial discounts to the prevailing market price. Steven Newman negotiated and approved these PIPE transactions on Xybernaut's behalf.

14. In the SEC filings associated with the 14 PIPE transactions, Xybernaut did not disclose whether the Financing Entities were related to one another. In each case, Xybernaut stated that the relevant Financing Entity was controlled by an individual who was an employee of either Granot or TCFS, the name of which was provided on behalf of Saltsman, Eitan and the Financing Entity. Several such employees were listed in the relevant filings, sometimes as controlling more than one Financing Entity, and their affiliations with Granot or TCFS were omitted in each instance.

The 2004 Undisclosed Dealing

15. In November 2004, Xybernaut entered into a bridge loan transaction in the amount of $5 million with one of the Financing Entities. In or around December 2004, the bridge loan was converted into a PIPE transaction and another Financing Entity entered into another PIPE transaction with Xybernaut for approximately $3.5 million. In total, the Financing Entities invested approximately $8,500,000 in Xybernaut. Saltsman and Eitan negotiated the terms of the investments with Steven Newman and Martin Weisberg. Among other things, Saltsman and Eitan agreed that the Financing Entities would invest $8,500,000, less 3.5% (the 3.5% discount), in exchange for the issuance of 9,167,386 share of Xybernaut's common stock and 4,583,693 warrants of Xybernaut. As part of the agreement, the Financing Entities would receive the shares of common stock at a price representing a 20% discount to the average closing price for Xybernaut's stock for the ten-day period, ending December 7, 2004.

16. Steven Newman and Weisberg agreed, on behalf of Xybernaut, to file a registration statement with the SEC for the common stock and warrants so that Saltsman and Eitan could sell these securities without any restrictions.

17. Saltsman and Eitan agreed with Steven Newman and Weisberg to hide the 3.5% discount, because they believed that its public disclosure would cause the price of Xybernaut's stock to fall. Saltsman, Eitan, Weisberg, and Steven Newman agreed to conceal the 3.5% discount from other officers and directors of Xybernaut by falsely referring to it as a finder's fee to create the false appearance that 3.5% of the 8,500,000 investment was to be paid to a third party as compensation for brokering

3

18. As part of the scheme, Steven Newman and Weisberg agreed to create a false finder's fee agreement. Saltsman and Eitan agreed to create a shell entity to serve as the apparent finder in connection with the investment of the $8,500,000. It was agreed that the investment in Xybernaut would be made by the Financing Entities Polar Properties Ltd. and Western Ventures, Ltd.

19. On November 24, 2004, Saltsman caused the transfer of approximately $5,000,000 to a bank account for the benefit of Xybernaut. In exchange for this investment of $5,000,000, Steven Newman and Weisberg, on behalf of Xybernaut, agreed to issue 5,392,580 shares and a total of 5,392,580 Xybernaut warrants to the Financing Entities.

20. On December 23, 2004, Saltsman caused the transfer of approximately $3,142,500 to a bank account for the benefit of Xybernaut. In exchange for this investment, Steven Newman and Weisberg, on behalf of Xybernaut, agreed to issue 3,774,806 Xybernaut shares and a total of 3,774,806 Xybernaut warrants to the Financing Entities. On the same day as the transfer, Xybernaut issued a press release announcing the investment of $8,500,000. The press release disclosed that the investors would receive a total of 9,167,386 shares of Xybernaut common stock at a price for Xybernaut's stock during the ten days prior to December 7, 2004. The press release was misleading because it failed to disclose the additional 3.5% discount that the Financing Entities received in connection with the investment.

21. On December 30, 2004, Xybernaut filed a registration statement with the SEC seeking to register the resale of the common stock issued in connection with the investment. Steven Newman and Weisberg signed the registration statement on behalf of Xybernaut. Saltsman knew that Xybernaut intended to file the registration statement and that the registration would conceal the fact that the Financing Entities received the additional 3.5% discount in connection with the $8,500,000 investment.

22. The registration statement stated that the natural persons holding voting or dispositive control over the shares owned by the Financing Entities Western Ventures Ltd. and Polar Properties Ltd., were Amit Lederman and Mary Lowenthal, respectively.

23. On January 12, 2005, the SEC declared the registration statement effective. As a result, the Financing Entities were able to sell without restriction the Xybernaut shares issued in connection with the $8,500,000 investment. On January 21, 2005 and April 8, 2005, the Financing Entities received the common stock from Xybernaut in connection with their $8,500,000 investment. The common stock was deposited into a brokerage account located in Brooklyn, New York.