SC:IJ/JPN
F.#:2007R00237

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -               07 CR 641 (S-2) (NGG)
                              08 CR 347 (NGG)
MARTIN WEISBERG,

             Defendant.

- - - - - - - - - - - - - - - - X

## GOVERNMENT'S SENTENCING MEMORANDUM

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

ILENE JAROSLAW
JOHN P. NOWAK
Assistant U.S. Attorneys

TABLE OF CONTENTS

PRELIMINARY STATEMENT.............................................1

PROCEDURAL BACKGROUND.............................................2

OVERVIEW OF THE SEPARATE SCHEMES.................................4

    I.   The PIPEs Case .............................................4

        A. Background of Xybernaut and Ramp.....................4

        B. The Scheme.........................................5

        C. The Corrupt Payments...............................11

            i.   The Xybernaut Corrupt Payments............11

        D. The False Statements to the SEC.....................14

        E. The False Finder's Fee Disclosures..................19

        F. The Defendant's Allocution.........................23

    II.  The Escrow Fraud Case .....................................23

        A. The TriState Conduct...............................28

APPLICABLE SENTENCING LAW........................................30

SENTENCING ANALYSIS .............................................32

    I.   Sentencing Guidelines Calculation .....................32

CONSIDERATION OF ALL OF THE § 3553 (a) FACTORS WARRANTS A
SENTENCE OF INCARCERATION ......................................36

    I. The Nature and Circumstances of the Offense Weigh
       Heavily in Favor of a Sentence of Incarceration..........36

    II.  A Period of Incarceration Would Be Sufficient,
        But Not Greater than Necessary, to Meet the Needs
        Set Forth in § 3553(a)(2) ..............................37

A. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense .........................38

B. The Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant ...................................38

III. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct Weighs Heavily in Favor of a Sentence of Incarceration .......39

IV. Weisberg's History and Characteristics Do Not Justify a Sentence Other Than a Sentence of Incarceration ........................................40

A. Weisberg Lied to Probation About His Assets.........42

B. Weisberg's Lies About Oceanic Indemnity.............47

V. Other § 3553(a) Factors ................................49

CONCLUSION ..............................................49

PRELIMINARY STATEMENT

The defendant Martin Weisberg's sentence is tentatively scheduled for June 28, 2013.  On May 21, 2012, the morning of jury selection in the matter of United States v. Weisberg, 08 CR 347 (NGG), Weisberg pled guilty to Count Eleven of the Indictment, charging money laundering in violation of 18 U.S.C. § 1957.  At that same time, Weisberg also pled guilty to Count One of the Second Superseding Indictment in a separate, unrelated case, United States v. Saltsman, et al., 07 CR 641 (S-2)(NGG).  Count One of the Second Superseding Indictment in that case charged Weisberg with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.  The defendant is scheduled to be sentenced on each of the convictions to which he pled guilty.

The government respectfully submits this sentencing memorandum and recommends that Weisberg's offense level computation should be a level 28 and that his Guidelines range should be 78 to 97 months.[1]  The government further recommends that the Court impose a sentence of incarceration.

---

[1] As the Court is aware, the government agreed not to ask for a specific sentence range in connection with the defendant's pleas of guilty.  Accordingly, the government submits this memorandum detailing the defendant's history and characteristics and the nature of both offenses, and asks the Court to impose sentences of incarceration for both counts of conviction.

PROCEDURAL BACKGROUND

On October 19, 2007, the government unsealed the
Indictment relating to <u>United States v. Saltsman, et al.</u>, 07 CR
641 (NGG) (hereinafter the "PIPEs case"), which alleged that
Weisberg engaged in a securities fraud conspiracy with certain
executives and investors to defraud two public companies, Ramp
Corporation and Xybernaut Corporation.  When the government
unsealed the indictment in that case, Weisberg, who was then a
partner with the law firm of Baker & McKenzie LLP, was in London
attending a partnership meeting.  Upon his return to the United
States, Weisberg was arrested and arraigned in connection with a
19-count indictment in the PIPEs case.

During the days and weeks that followed the
defendant's arrest, the government learned that during 2006 and
2007, Weisberg had engaged in a separate, unrelated scheme to
defraud a hedge fund client, SIAM Capital Management ("SIAM").
In connection with that scheme, Weisberg lied to representatives
of SIAM about the structure of an escrow account that held $30
million, and misappropriated more than $1.3 million in interest
from the escrow account for his own benefit.  In May 2008, a
grand jury sitting in the Eastern District of New York returned
an 11-count indictment charging Weisberg with defrauding SIAM in

2

connection with the $30 million escrow account.  See United
States v. Weisberg, 08 CR 347 (NGG) (hereinafter the "Escrow
Fraud case").  The Court ultimately set jury selection and trial
in the Escrow Fraud case for May 21, 2012.[2]  As noted above, on
May 21, 2012, the morning of jury selection, Weisberg pled
guilty to Count Eleven of the Escrow Fraud case and Count One of
the PIPEs case.

On February 12, 2013, the Probation Department issued
its Presentence Investigation Report ("PSR"), which calculated a
Guidelines range of 210-262 months, but noted that, based on the
statutory maximums, the Guidelines imprisonment range is
restricted to 180 months.  See PSR 142-43.

On March 27, 2013, Weisberg publicly filed a redacted
sentencing submission in which he states that he feels shame and
deep remorse for "the conduct that has brought him to this day,"
which he refers to as "serious lapses in judgment."  Defendant
Weisberg's Sentencing Memorandum (Docket #210 of the PIPEs case)
("Def. Memo.") at 1.  He asks that the Court sentence him to a
term of probation.  Def. Memo. at 6.

_____

[2] The Escrow Fraud case was the subject of significant pretrial
litigation.  See, e.g., Memorandum & Opinion, dated March 9,
2012 (Docket #167 of the Escrow Fraud Case).

3

OVERVIEW OF THE SEPARATE SCHEMES

I.   The PIPEs Case

     A.   Background of Xybernaut and Ramp

          Since it became a public company, Xybernaut was
unprofitable.  To cover its day-to-day expenses, the company
raised money through PIPE transactions.[3]  In fact, between 1996
and December 2004, the company filed approximately 22
registration statements to register the resale of the securities
issued in connection with the PIPE financing.  During that
period, Xybernaut's stock traded on the NASDAQ Small Cap Market.

          On March 31, 2005, two months after receiving a
subpoena from the U.S. Securities and Exchange Commission
("SEC"), Xybernaut disclosed in a press release that its audit
committee had engaged a law firm to conduct an internal
investigation relating to internal controls at Xybernaut.  As a
result of the investigation, the company delayed filing its 2004
Form 10-K with the SEC.  On April 8, 2005, Xybernaut informed

_____

[3] The term PIPE refers to a private investment in public equity.
It generally involves the issuance of securities to investors in
a private placement with an agreement by the public company to
file a registration statement with the U.S. Securities and
Exchange Commission allowing for the public resale of the
investors' securities at some point in the future.  If the U.S.
Securities and Exchange Commission declares the registration
statement effective, the PIPE investors are essentially free to
sell the securities to the public.

4

its investors that they should no longer rely on its financial statements for the period 2002 to 2004. On April 14, 2005, its auditor resigned, and shortly thereafter, Edward and Steven Newman were removed as the company's CEO and COO, respectively. Finally, on May 12, 2005, NASDAQ Stock Market delisted the company as a result of its failure to file its 2004 Form 10-K.

Ramp, too, was unprofitable and paid its expenses from the proceeds of PIPE transactions. During the period December 2002 through 2004, the company filed approximately seven registration statements to register the resale of the securities that it had issued in PIPE transactions. On May 22, 2005, Ramp disclosed that in December 2003, its then president and CEO, Andrew Brown, received cash from an advisor to one of Ramp's investors. Brown was terminated from the company, and as a result, Ramp's auditor resigned. On May 23, 2005, the American Stock Exchange suspended trading of Ramp's stock.

B.  The Scheme

Between 2001 and 2005, Zev Saltsman and his partner Menachem Eitan, along with Weisberg, Edward and Steven Newman (the "Newmans"), and Brown, "devised and carried out a scheme to defraud the shareholders of Xybernaut and Ramp by causing Xybernaut and Ramp secretly to issue discounted PIPE shares to

5

Saltsman and Eitan" through various nominee entities.  See Second Superseding Indictment in the PIPEs Case ("SSI") ¶ 19. In fact, Saltsman and Eitan used 37 nominee entities to conceal their involvement in a total of 24 Ramp and Xybernaut PIPE transactions.  In total, Xybernaut and Ramp received more than $67 million and $21 million in financing, respectively, through investments made by Saltsman and Eitan.

Saltsman and Eitan used multiple nominee entities and concealed their involvement in the PIPE transactions primarily for two reasons.  First, if Saltsman had disclosed his ownership over more than 5% of a company's stock, he would have reporting problems under Sections 13 and 16 of the Securities Exchange Act of 1934.  See Jordan Young FBI Report (Attached as Exhibit B). Second, Saltsman would have to obtain shareholder approval if he wanted to sell such large quantities of stock himself.  See Jordan Young FBI Report (Attached as Exhibit B).

When the registration statements registering the resale of the Ramp and Xybernaut PIPE shares became effective, all of the shares issued to the nominee investors in the PIPEs were electronically transferred to a few brokerage accounts at International Securities Corp. and Pond Equities ("Pond"), two registered broker-dealers.  Saltsman and Eitan controlled those

6

brokerage accounts.  For example, between April and September
2003, one of the nominee brokerage accounts in the name of Dune
Holdings Ltd. received over 41 million shares of Xybernaut
shares that were issued in Xybernaut PIPE transactions.[4]  The
registration statements filed in connection with the issuance of
those shares, which Weisberg prepared, stated that 8 different
investors were to receive those shares.  Despite that
representation, all of the shares were deposited into the
account of one entity, not eight.  The 41 million shares
represented more than 20% of Xybernaut's outstanding number of
shares at that time.  Saltsman and Eitan used the proceeds from
the Dune account to finance additional PIPE transactions in
2003.

Saltsman and Eitan also used two Canadian brokerage
accounts to accumulate short positions prior to the effective
date of the registration statements.[5]  When the SEC declared the
resale registration statements to be effective, Saltsman and

---

[4] During testimony before the SEC, Weisberg admitted that he
assumed that Dune was Saltsman's company.  See Weisberg SEC
Testimony (Attached as Exhibit Z).

[5] The term "short position" refers to a securities trading
position resulting from a short sale of a security (i.e., a sale
of a security that the investor does not own at the time of the
sale).  Saltsman and Eitan used the shares issued to their
nominees to satisfy, or "cover," their short positions that they
held in various brokerage accounts.

Eitan deposited the PIPE shares into the brokerage accounts that they controlled, and covered those short positions with the shares issued in the PIPE transactions.  To cover the short positions, Saltsman and Eitan, at times, executed wash sales between the Canadian accounts and the domestic accounts at Pond and International Securities Corp.  For example, on occasion, Saltsman and Eitan sold Xybernaut shares from the Dune account to one of the Canadian accounts to cover short positions in the Canadian accounts.

Saltsman and Eitan transferred the majority of the proceeds from their brokerage accounts to an escrow account (the "Beeston Investments Account") at the law firm of Krieger and Prager in New York.  The funds in that account were controlled by Saltsman and Eitan.  Saltsman and Eitan used some of these funds to further the fraudulent scheme by obtaining additional discounted shares of stock.  They also transferred funds to various offshore accounts which they controlled, and as discussed below, they used some of these funds to make the corrupt payments to the companies' officers and directors.

To conceal their control over the nominee entities, Saltsman and Eitan used the services of Turks and Caicos First Secretarial ("TCFS"), an offshore management company located in

8

the Turks and Caicos Islands, and Granot Strauss, Adar & Co.
("Granot Strauss"), an Israeli law firm.  Employees of TCFS and
lawyers and employees of the Granot Strauss law firm agreed to
act as nominees for Saltsman and Eitan.  Although these
individual nominees had no actual control over the PIPE
negotiations or the disposition of the shares, their names
appeared in numerous registration statements, which Weisberg
prepared, as the purported beneficial owners and control persons
of the nominee entities that received the PIPE shares.  Weisberg
knew that Saltsman and Eitan controlled the entities, and he
understood that they were primarily investing Eitan's money.
See Jordan Young FBI Report (Attached as Exhibit A).  Saltsman
and Eitan's primary contact at Granot Strauss was an individual
named Richard Naimer.[6]

The officers and directors of Xybernaut and Ramp
conspired with Saltsman and Eitan to conceal the scheme.
Specifically, although officers and directors of the companies

---

[6] Richard Naimer was also listed as a principal of one of the
Canadian accounts that Saltsman and Eitan used to short Ramp and
Xybernaut stock, and as discussed below, he is referenced in
connection with an account in the name of Samira Management, an
entity through which Eitan made corrupt payments to Steven
Newman, the former COO of Xybernaut.  See Samira Management
Account Opening Documents (Attached as Exhibit C).  Richard
Naimer also acted the purported trustee for certain trusts that
the Newmans controlled.  See EFG Bank Account Opening Documents
(Attached as Exhibit D).

knew that Saltsman and Eitan controlled the offshore nominee entities and, hence, were the beneficial owners of the discounted shares of stock, they failed to identify them in various documents and reports they filed with the SEC.  Their failure to identify Saltsman and Eitan as the beneficial owners of the stock constituted a violation of SEC regulations – regulations designed to protect the investing public.

For example, between December 2002 and July 2004, Ramp executed ten PIPE transactions and numerous other financial transactions with at least 13 different nominee entities controlled by Saltsman and Eitan.  In connection with these PIPE transactions, the nominee entities obtained approximately 162,000,000 shares of Ramp common stock at substantial discounts to the market price.  Andrew Brown, a former officer and director of Ramp, negotiated and approved the majority of these PIPE transactions on Ramp's behalf.

In the SEC filings that Weisberg prepared in connection with the Ramp PIPE transactions, Ramp never disclosed that Saltsman and Eitan's nominee entities were related to one another, or that each entity was controlled by Saltsman and Eitan.  Instead, in Ramp's SEC filings, Ramp falsely stated that the relevant nominee entity was controlled by an employee of

10

either Granot Strauss or TCFS.  In fact, these individuals were nominees of Saltsman and Eitan.

        C.   The Corrupt Payments

        In furtherance of this scheme, Saltsman and Eitan paid Weisberg, Steven Newman and Brown undisclosed kickbacks in exchange for their involvement in the scheme.  SSI ¶ 19.  Those corrupt payments, which are considered related party transactions, should have been disclosed in Ramp and Xybernaut's SEC filings.  For example, in or about December 2003, Eitan met with Andrew Brown, then Ramp's President, in the lobby of a hotel located near Grand Central Station in New York City and gave Brown approximately $50,000 in cash.  The cash was considered to be payment in appreciation for Brown's assistance with the PIPE transactions.  This corrupt payment was never disclosed to the investing public, as required by SEC regulations.

        i.   The Xybernaut Corrupt Payments

        In 2003 and 2004, Saltsman and Eitan also paid Weisberg and Steven Newman more than $4.1 million in corrupt payments.  These payments, as well as the relationships that developed between the companies' management and Saltsman and

Eitan, were never disclosed in Ramp's or Xybernaut's corporate filings or registration statements.

For example, on or around November 28, 2003, Ramp, formerly known as Medix Resources, Inc., filed a registration statement with the SEC registering, among other things, the resale of shares issued to three entities under the control of Saltsman and Eitan: Canary Point Limited ("Canary Point"), Firewall Universal Limited ("Firewall"), and Hazel Investments Limited ("Hazel"). Neither the registration statement nor its amendment, both of which Weisberg prepared, disclosed that the three entities were controlled by Saltsman and Eitan, as required by law.

On or around December 31, 2003, in connection with the aforementioned registration statement, 16 million shares of Ramp stock were deposited into brokerage accounts maintained in the names of Canary Point, Firewall, and Hazel at Pond Equities, located in Brooklyn, New York. On or around January 2, 2004, the accounts sold the approximately 16 million shares. Between January 8, 2004 and January 14, 2004, these accounts transferred the proceeds of the sales, more than $9.6 million, to an account in the name of Samira Management in Luxembourg. See Summary of Wire Transfer Activity to Samira Management (Attached as Exhibit

E).  Eitan was the beneficial owner of Samira Management, but as he did with the other nominee entities, Eitan used lawyers at Granot Strauss, including Richard Naimer, to act on his behalf. See Samira Management Account Opening Documents (Attached as Exhibit C).

Then, between January 20, 2004 and April 22, 2004, Eitan made corrupt payments (totaling $2 million) from the Samira Management account to accounts associated with trust accounts controlled by Steven Newman, a former officer and director of Xybernaut.  See Summary of Wire Transfer Activity to Samira Management (Attached as Exhibit E); Account Opening Summary for EFG Private Bank (Attached as Exhibit D).[7]  In fact, on January, 22, 2004, the Samira Account transferred $500,000 to an account controlled by defendant Steven Newman.  See Summary of Wire Transfer Activity to Samira Management (Attached as Exhibit E).  These payments, which are considered related party transactions under the securities laws, were never disclosed, as required by law.

Additionally, on or about November 18, 2003, Eitan and Saltsman gave Martin Weisberg and Steven Newman approximately $1

---

[7] At the time of the transfer, Richard Naimer, then a partner at the Granot Strauss law firm, acted as the trustee for the trusts.  See Account Opening Summary for EFG Private Bank (Attached as Exhibit D).

13

million in kickbacks.  Eitan and Saltsman paid these kickbacks
by transferring, or causing others to transfer of, approximately
$1 million of their stock proceeds from their brokerage accounts
at Pond, to the Beeston Investments Account held at Kreiger and
Prager, and then to an account in the name of TCFS at Barclays
Bank, London.  The funds were then ultimately transferred to an
"escrow account" at Chase Bank maintained by Weisberg.[8]
Thereafter, on or about December 12, 2003, Weisberg transferred
approximately $500,000 of those funds to two banks on behalf of
Steven Newman.  Although Martin Weisberg and Steven Newman were
required to disclose these kickbacks to the SEC, they failed to
do so.  Summaries of those payments and other corrupt payments
are attached as Exhibit F.

          D.   The False Statements to the SEC

The co-conspirators made numerous false statements in
furtherance of the fraudulent scheme. For example, in September
2003, Weisberg lied to the SEC in connection with certain Ramp
PIPE transactions that occurred in 2003.  Specifically, in June
2003, Ramp filed a registration statement with the SEC relating
to three PIPE transactions involving Saltsman and Eitan's

---

[8]  These stock proceeds had previously been transferred from
brokerage accounts Eitan and Saltsman controlled at Pond
Equities directly, or indirectly through Krieger and Prager's
escrow account, to the TCFS account.

nominees, and that, in connection with its review of the
registration statement, the SEC had some questions.  See
September 22, 2003 SEC Comment Letter at 1 (Attached as Exhibit
G).  Essentially, the SEC asked Ramp whether it had engaged in
any financing or offerings of securities between the date of the
filing of the registration statement and September 2003.  Id.
On September 22, 2003, Saltsman sent the SEC's comment letter to
Weisberg by email.  See September 22, 2003 Email (Attached as
Exhibit H).  The very next day, an attorney involved in the PIPE
transactions suggested to Weisberg that Ramp withdraw the
registration statement, thus avoiding any issue relating to the
SEC's inquiry.  See September 23, 2003 Email (Attached as
Exhibit I).

        Instead of withdrawing the registration statement or
telling the truth to the SEC, i.e., that Ramp had in fact
engaged in financing during that time, Weisberg lied to the SEC
by falsely stating that no financing had occurred during the
specified period.  See September 29, 2003 Letter at 2 (Attached
as Exhibit J).  Prior to signing the false letter to the SEC,
Weisberg showed the SEC's comment letter to an associate in his
law firm.  See Jordan Young FBI Report, dated July 5, 2006, at 1
(Attached as Exhibit A).  On September 23, 2003, Weisberg, the

15

associate, Saltsman and others met to discuss the SEC's comment letter.  Id. at 1-2.  Shortly thereafter, the associate prepared the September 29, 2003 letter that contained false statements about Ramp's offerings of securities prior to September 2003. Id. at 3-4.  The associate, however, did not feel comfortable with the language in the letter and, as a result, put the letter under Weisberg's letterhead.  The associate told Weisberg that he would not sign the letter because it was blatantly false. Id.  Weisberg agreed to sign the letter to the SEC, and subsequently informed Saltsman of the status of the SEC's review of Weisberg's false letter and Ramp's registration statement. See, e.g., October 8, 2003 Email (Attached as Exhibit K). Saltsman was appreciative of Weisberg's efforts, and the SEC approved the registration statement.  See October 14, 2003 Email (Attached as Exhibit L) ("Thank you for [Ramp]").

To further the false statements, and to continue the scheme, Weisberg wrote to Ramp's auditors who began to question the classification of the investment capital that Ramp received through the PIPEs.  In that letter, Weisberg admitted that Ramp engaged in securities offerings during the period between Ramp's filing of the registration statement and September 2003.  See November 10, 2003 Letter to BDO Seidman LLP at 1-2 (Attached as

Exhibit M).  Weisberg, however, claimed in the letter that he
advised Ramp that its offering of securities in those
transactions violated Section 5 of the Securities Act of 1933
and were not validly issued, and thus void.  Id. at 2.  In
rather unbelievable fashion, Weisberg opined that "because
[those] securities were not validly issued, they could not
confer upon the Investors the rights and benefits contemplated
thereby," and that there was no requirement for Ramp to notify
either the SEC or the American Stock Exchange of the violation,
and any disclosure issue was the sole responsibility of the
company.  Id.  Moreover, this letter confirms the fact that
Weisberg knew about the securities transactions when he falsely
wrote to the SEC on September 29, 2003 that Ramp did not engage
in any offerings of securities.  Id. at 2. (Noting that on
September 30, 2003, the company entered into "Waiver and
Termination Agreements" with the investors based on Weisberg's
advice that the offering of securities violated the law).[9]

---

[9] In fact, Weisberg was lying to Ramp's auditors when he wrote
that Ramp entered into the "Waiver and Termination Agreements"
with the Investors on September 30, 2003.  The company did not
enter into any such agreements with Saltsman and Eitan's
nominees until the end of October 2003, after the SEC had
already declared the registration statement effective.  Weisberg
lied to the auditor in order to ensure that the "Waiver and
Termination" fell within Ramp's quarterly period, which ended on
September 30, 2003.

17

Weisberg's false statements to the SEC, and his subsequent statements to Ramp's auditors, furthered the scheme and allowed Saltsman and Eitan to profit from their short selling.[10]  In fact, any further delay caused by the SEC's inquiry would have hindered Saltsman and Eitan's short trading strategy and their ability to profit, and it would have hindered Ramp's ability to receive capital, and thus survive.  See Jordan Young FBI Report at 2 (Attached as Exhibit A).[11]  Weisberg made those false statements at the same time that he and Steven Newman were receiving kickbacks from Saltsman and Eitan.  SSI ¶ 51.

---

[10] Weisberg was aware of Saltsman's short selling activities. See February 21, 2003 Email (Attached as Exhibit Y); Jordan Young FBI Report (Attached as Exhibit B).  Moreover, Weisberg had a personal relationship with Saltsman and had represented him in connection with a customs enforcement issue.  See April 30, 2003 Email (Attached as Exhibit X); Jordan Young FBI Report (Attached as Exhibit A).

[11] The Indictment alleges that Saltsman and Eitan, in order to lock in a profit from the scheme, established large short positions in Xybernaut and Ramp stock prior receiving the PIPE shares.  Upon their receipt of the PIPE shares, Saltsman and Eitan used the PIPE shares to cover their short positions, which enabled them to profit from the difference between the price at which they sold the shares short and the price at which they purchased the PIPE shares.  SSI ¶ 19.

E.   The False Finder's Fee Disclosures

Additionally, in November 2004, Xybernaut entered into a bridge loan transaction in the amount of $5 million with one of the Financing Entities. See Summary of Agreed Upon Facts ¶¶ 15-23 (Docket #214-1 of the PIPEs case).  In or around December 2004, the bridge loan was converted into a PIPE transaction and another Financing Entity entered into another PIPE transaction with Xybernaut for approximately $3.5 million. In total, the Financing Entities invested approximately $8,500,000 in Xybernaut. Saltsman and Eitan negotiated the terms of the investments with Steven Newman and Martin Weisberg. Among other things, Saltsman and Eitan agreed that the Financing Entities would invest $8,500,000, less 3.5% (the 3.5% discount), in exchange for the issuance of 9,167,386 share of Xybernaut's common stock and 4,583,693 warrants of Xybernaut. As part of the agreement, the Financing Entities would receive the shares of common stock at a price representing a 20% discount to the average closing price for Xybernaut's stock for the ten-day period, ending December 7, 2004.   Id.

Steven Newman and Weisberg agreed, on behalf of Xybernaut, to file a registration statement with the SEC for the

19

common stock and warrants so that Saltsman and Eitan could sell these securities without any restrictions.   Id.

Saltsman and Eitan agreed with Steven Newman and Weisberg to hide the 3.5% discount, because they believed that its public disclosure would cause the price of Xybernaut's stock to fall. Saltsman, Eitan, Weisberg, and Steven Newman agreed to conceal the 3.5% discount from other officers and directors of Xybernaut by falsely referring to it as a finder's fee to create the false appearance that 3.5% of the 8,500,000 investment was to be paid to a third party as compensation for brokering the transaction and introducing Saltsman and Eitan to Xybernaut, Steven Newman and Weisberg.   Id.

As part of the scheme, Steven Newman and Weisberg agreed to create a false finder's fee agreement. Saltsman and Eitan agreed to create a shell entity to serve as the apparent finder in connection with the investment of the $8,500,000. It was agreed that the investment in Xybernaut would be made by the Financing Entities Polar Properties Ltd. and Western Ventures, Ltd.  Id.

On November 24, 2004, Saltsman caused the transfer of approximately $5,000,000 to a bank account for the benefit of

Xybernaut. In exchange for this investment of $5,000,000, Steven
Newman and Weisberg, on behalf of Xybernaut, agreed to issue
5,392,580 shares and a total of 5,392,580 Xybernaut warrants to
the Financing Entities.  Id.

        On December 23, 2004, Saltsman caused the transfer of
approximately $3,142,500 to a bank account for the benefit of
Xybernaut. In exchange for this investment, Steven Newman and
Weisberg, on behalf of Xybernaut, agreed to issue 3,774,806
Xybernaut shares and a total of 3,774,806 Xybernaut warrants to
the Financing Entities. On the same day as the transfer,
Xybernaut issued a press release announcing the investment of
$8,500,000. The press release disclosed that the investors would
receive a total of 9,167,386 shares of Xybernaut common stock at
a price for Xybernaut's stock during the ten days prior to
December 7, 2004. The press release was misleading because it
failed to disclose the additional 3.5% discount that the
Financing Entities received in connection with the investment.
Id.

        On December 30, 2004, Xybernaut filed a registration
statement with the SEC seeking to register the resale of the
common stock issued in connection with the investment. Steven
Newman and Weisberg signed the registration statement on

21

behalf of Xybernaut. Saltsman knew that Xybernaut intended to file the registration statement and that the registration would conceal the fact that the Financing Entities received the additional 3.5% discount in connection with the $8,500,000 investment.  Id.

The registration statement stated that the natural persons holding voting or dispositive control over the shares owned by the Financing Entities Western Ventures Ltd. and Polar Properties Ltd., were Amit Lederman and Mary Lowenthal, respectively.[12]  Id.

On January 12, 2005, the SEC declared the registration statement effective. As a result, the Financing Entities were able to sell without restriction the Xybernaut shares issued in connection with the $8,500,000 investment. On January 21, 2005 and April 8, 2005, the Financing Entities received the common stock from Xybernaut in connection with their $8,500,000 investment. The common stock was deposited into a brokerage account located in Brooklyn, New York.  Id.

---

[12] Amit Lederman was an attorney with the law firm of Granot Strauss, and Mary Lowenthal, who was also a purported control person of certain Ramp PIPE investors, was effectively a secretary at Granot Strauss.

F.    The Defendant's Allocution

At his plea on May 21, 2012, Weisberg allocuted that between April 2001 and December 2004, he agreed with others to file certain false disclosure documents with the U.S. Securities and Exchange Commission.  See May 21, 2002 Transcript of Plea at 32-33 (Attached as Exhibit N).  He admitted that he did not accurately describe PIPE transactions for Xybernaut, and that as part of his agreement with others, documents concealed the existence of related party transaction about which Weisberg was aware.[13]  Id.  Weisberg also allocuted that he took part in a transaction involving false disclosures made to the U.S. Securities and Exchange Commission in connection with a finders fee involving the above-referenced November 2004 Xybernaut PIPE transaction.  Id.

II.  The Escrow Fraud Case

In connection with the Escrow Fraud case, Weisberg was charged in an 11-count indictment arising from his theft of interest on an attorney escrow account, an account which he had told the client (SIAM) was a non-interest-bearing IOLA account. The first ten counts charge wire fraud (in the form of e-mails

---

[13] The related party transactions that Weisberg referred to is a clear reference to the payments from Saltsman and Eitan to Weisberg and Steven Newman, as alleged in the Second Superseding Indictment of the PIPEs case.

23

and money wire-transfers) pertaining to the $30 million to be held in escrow; count 11 charges money laundering in connection with $200,000 of the proceeds of the fraud.  This conduct is unrelated to Weisberg's conduct in the PIPEs case.

In 2006, SIAM retained the defendant as an escrow agent to hold $30 million on its behalf, pending litigation about the disposition of the funds.  At that time, the defendant represented to SIAM that the funds had to be held in a non-interest-bearing IOLA account, and that the interest that would otherwise accrue would be remitted to a fund for the purpose of providing legal assistance to low income individuals.  See, e.g., September 14, 2006 Email (Attached as Exhibit AA).

Instead, the defendant immediately negotiated with the bank (Chase) for the highest possible interest rate on the funds, ultimately obtaining a rate of approximately 4.75%.  See, e.g., September 12, 2007 Email (Exhibit BB).  The defendant received monthly statements showing the interest, and transferred out of the account approximately $1.3 million of the $1.6 million in interest earned on the $30 million principal. As part of his scheme, Weisberg provided to Chase a fraudulent escrow agreement, which falsely stated that the escrow funds could be invested or otherwise earn interest.  To conceal his

24

scheme, when the client requested monthly bank statements for the escrow account, the defendant lied and falsely stated that he did not receive monthly statements for the escrow account, when in fact he did.

On or about October 18, 2007, the indictment relating to the PIPEs case was unsealed.  United States v. Saltsman et al., 07 CR 641 (NGG).  As noted above, Weisberg was in London at the time, and was arrested on his return to the United States on October 22, 2007.

Immediately after the unsealing, Peter Ginsberg, attorney for SIAM, notified the defendant that his client desired to move its escrowed funds to the custody of another escrow agent.  Weisberg attempted to persuade Ginsberg to change his client's mind, but did not prevail.  On October 19, 2007, Ginsberg told Weisberg that SIAM's decision to revoke his control over the escrow funds was final.

On or about October 31, 2007, Weisberg initiated the transfer from his account to the new escrow agent of the principal amount of the escrow, which was $29,395,833.  This figure constituted the original $30 million less expenses and deductions authorized by SIAM – but did not include any interest earned on the account.  This figure also corresponded to the

balance that, in a letter to SIAM dated September 7, 2007, Weisberg stated to be "the current amount held in escrow as of August 31, 2007."

After Weisberg's arrest in the securities fraud case, his law firm, Baker & McKenzie, placed him "on leave" and commenced an internal investigation of his activities at the firm.

In November 2007, Weisberg made a comment to Ginsberg, the substance of which was that Weisberg would get the interest back to Ginsberg's client. Ginsberg was taken aback by the comment, and contacted his client to confirm his recollection that Weisberg had told them that the funds were held in a non-interest-bearing account. Ginsberg subsequently obtained the bank statements pertaining to the escrow account. It was then that he and SIAM discovered for the first time that the escrowed funds had in fact been earning interest since the inception of the escrow account. Weisberg had lied to them about this fact, and about the very existence of bank statements for the escrow account. Additionally, the bank statements revealed numerous disbursements from the escrow account that had never been authorized by SIAM. See Summary of Weisberg's Personal Disbursements (Attached as Exhibit O).

On December 11, 2007, Weisberg initiated the transfer of the accrued interest on the SIAM principal that was still remaining in the escrow account - $366,755.15 - to SIAM's new escrow agent.  The defendant also instructed his bank to transfer the interest for December to SIAM's new escrow agent on January 3, 2008.

On December 31, 2007, the new escrow agent advised Ginsberg that it had received from the defendant (on or about December 21, 2007) additional transfers of (1) $1.3 million from a Citibank account referencing "Weisberg Y," and (2) and $57,318.10 from a Citibank account in the customer name of Tracey B. Weisberg, the defendant's wife.  On January 2, 2008, Ginsberg stated that SIAM had performed a reconciliation and that these amounts - together with the $366,755.15 - reflected the amount of interest that had been earned on the $30 million escrow account.

These two late-December 2007 transfers – totaling $1,357,318 – represented the amount of money that the defendant had embezzled from the escrow account.  But for Weisberg's arrest in the PIPEs case, Weisberg never would have repaid the interest, or even disclosed the fact that he had received the interest.

27

In a last ditch effort to protect himself and provide a defense for his actions, Weisberg provided to Ginsberg and his client with a letter, written on Oceanic Indemnity letterhead, which purports to guarantee the monies that Weisberg "barrowed" [sic] from his client.  See June 2007 Oceanic Indemnity Letter (Attached as Exhibit P).  This letter was a fraud, and was designed to lend legitimacy to Weisberg's theft.

A.   The TriState Conduct

In a separate transaction that occurred during the same period of the Escrow Fraud case, the defendant entered into a separate escrow agreement with TriState.  See TriState Escrow Agreement (Attached as Exhibit Q).  On March 9, 2007, TriState tendered $226,000 to the defendant of which, pursuant to the agreement, the defendant was entitled to a $3,500 escrow agent fee.

According to the agreement, the sum of $220,000 was to be held in escrow, "which amount the Escrow Agent shall hold in a segregated IOLA (non-interest bearing) bank account . . . ."

Instead of holding the money in a non-interest bearing account, the defendant immediately deposited the $226,000 into an interest-bearing bank account under his control (the "X

account"). Also that day, he transferred $221,000 out of the X account and purchased a Certificate of Deposit.

On May 14, 2007, Russell & Fig, attorneys for TriState, wrote to the defendant to inform him that a court had ruled in TriState's favor on April 27, 2007, and therefore, the funds should be released from escrow. See May 14, 2007 Email (Attached as Exhibit S); see also Exhibit T.

In response, the defendant wire-transferred $200,000 – from the interest proceeds on the SIAM escrow funds – to Russell & Fig on Long Island. Russell & Fig received these funds into its IOLA account on June 1, 2007, and on June 4, 2007, disbursed them by check to TriState.

On June 12, 2007, Russell & Fig sent an e-mail to the defendant noting that the amount due back to TriState was $222,500 (the original $226,000 less the escrow agent fee). The firm asked the defendant to remit the remaining $22,500, evincing the understanding stated in the escrow agreement that no interest was to be earned on the IOLA escrowed funds.

On June 14, 2007, the defendant's X account received $223,217.91, which funds appear to be the proceeds of the $221,000 Certificate of Deposit purchased three months previously.

On June 25, 2007, Russell & Fig again inquired about the funds due to its client.  <u>See</u> June 25, 2007 Email (Attached as Exhibit U).  The defendant promised to send a check for $20,000.  Russell & Fig advised the defendant that the amount due to TriState was $22,500, and the defendant then agreed to send a check in that amount, which appears to have been paid from yet another unrelated Weisberg-controlled account.

APPLICABLE SENTENCING LAW

Although the Sentencing Guidelines are no longer mandatory, they continue to play a critical role in achieving the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." <u>United States v. Booker</u>, 543 U.S. 220, 252 (2005).  Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005). Rather, the applicable Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.  <u>United States v. Rubenstein</u>, 403 F.3d 93, 98-99 (2d Cir. 2005).

30

In furtherance of that goal, a district court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." Booker, 543 U.S. at 259-60 (citations omitted).

The Second Circuit has instructed district courts to engage in a three-step sentencing procedure. See Crosby, 397 F.3d at 103. First, a district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a non-Guidelines sentence." Id. at 112. Second, a district court must consider whether a departure from that Guidelines range is appropriate. Id. Third, a district court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and

just sentence under all of the circumstances.  <u>United States v.</u>
<u>Jones</u>, 460 F.3d 191, 195 (2d Cir. 2006).

SENTENCING ANALYSIS

I.   <u>Sentencing Guidelines Calculation</u>

The Presentence Investigation Report included the
following calculation with respect to Weisberg's offense level
computation for the PIPES case conviction:

| | |
|---|---|
| Base Offense Level (2B1.1(a)(2)) | 6 |
| Loss Enhancement[14] (2B1.1(b)(1)(K)) | +24 |
| Enhancement for Sophisticated Means (2B1.1(b)(10)) | +2 |
| Enhancement for Case Involving a Violation of<br>Securities Law, and Defendant Was a Director of<br>a Public Company (2B1.1(b)(18)(A)) | +4 |
| Enhancement for an Offense that Substantially<br>Endangered the Solvency of a Publicly Traded<br>Company (2B1.1(b)(15)(B)) | +4 |
| **Total** | **40** |

PSR ¶¶ 84-92.

Additionally, the Presentence Investigation Report
included the following calculation with respect to Weisberg's
involvement in the Escrow Fraud case:

---

[14] The loss contained in the Pretrial Investigation Report is $55
million, which is based on Saltsman and Eitan's gain from
trading in Ramp and Xybernaut stock.  PSR ¶ 85.

32

| | |
|---|---|
| Base Offense Level (2S1.1(a)(2) and 2B1.1(b)(1)(I)) | 24 |
| Conviction under 18 U.S.C. § 1957 (2S1.1(b)(2)(A)) | +1 |
| Enhancement for Abuse of Trust (3B1.3) | +2 |
| **Total** | **27** |

PSR ¶¶ 93-98.

Based on a multiple count adjustment, Probation calculated a total offense level of 37 and a Criminal History Category of I.  PSR ¶¶ 99-106.  Accordingly, the Presentence Investigation Report states that Weisberg's Guideline imprisonment range is 210 to 262 months.  PSR ¶ 143.  However, because of statutory maximums, Weisberg's guidelines imprisonment is restricted to 180 months.  Id.

The government agrees with Probation's Guidelines calculation with respect to the PIPEs case, with two exceptions. First, the government does not agree that the loss in that case equals the $55 million.  Instead, the loss should equal the $4.1 million that Weisberg and Steve Newman received from Saltsman and Eitan.  Those corrupt payments constituted related party transactions and should have been disclosed.  In fact, those funds constituted the "related party transactions" that Weisberg referred to in his allocution.  Moreover, those funds should

33

have been paid to Xybernaut, and as a result, Xybernaut suffered a loss.[15]

Second, the government does not take the position that Weisberg's conduct substantially endangered the solvency of a publicly traded company.  As noted above, Ramp and Xybernaut were unable to generate significant revenue through the sale of goods and services, and as a result, relied on the PIPE funding from Saltsman and Eitan.  While Saltsman and Eitan certainly preyed upon Ramp and Xybernaut, the conduct of the conspirators did not substantially endanger the solvency of these companies,

---

[15] Weisberg contends that a loss of $4.1 million should not apply because the money that he and Steven Newman received were from loans from the trusts associated with Steven Newman.  That position, however, is belied by the clear flow of funds from Saltsman and Eitan accounts to Weisberg and Steven Newman. Weisberg further claims that there were contemporaneous documents that support his position that these monies were "loans."  At this point in the litigation, after the years of investigation, it is easy to conclude that those purported contemporaneous documents are not worth the paper that they were written on.  Weisberg further claims that he paid back the "loans."  To be clear, Weisberg began paying money back to the Steven Newman trust only after he learned of the government's investigation.  Lastly, the defendant claims that the trustee of the trusts (i.e., the same Richard Naimer referenced above) has "acknowledged it was his error in using the TCFS account to wire funds to [Weisberg]."  This proffer, that it was simply an error, does not save the day for Weisberg, and it does not explain the $2 million transferred directly from the Samira Management account to Steven Newman's trust accounts, nor does it explain the payment of $50,000 in cash from Eitan to Brown in 2003.

neither of which could be considered solvent without the PIPE financing.

Accordingly, the government respectively submits that the correct Guidelines calculation relating to the PIPEs case should be a level 30.

With respect to Probation's calculation of the Guidelines for the Escrow Fraud case, the government respectfully submits that the Court adopt the Guidelines calculation contained in the defendant's plea agreement, which contains an offense level of 25.  In this respect, the government agrees with the defendant as to the Guidelines calculation.

Accordingly, the government submits that the Court calculate the defendant's Guidelines range to be a level 28, which carries a range of imprisonment of 78 to 97 months, given that the defendant falls within Criminal History Category I. This Guidelines calculation is consistent with the Guidelines calculation contained in the defendant's plea agreement.

<u>CONSIDERATION OF ALL OF THE § 3553(a) FACTORS</u>
<u>WARRANTS A SENTENCE OF INCARCERATION</u>

I.  <u>The Nature and Circumstances of the Offense Weigh Heavily</u>
    <u>in Favor of a Sentence of Incarceration</u>

Section 3553(a)(1) requires a district court, in determining the particular sentence to be imposed, to consider "the nature and circumstances of the offense." In this case, the nature and circumstances of the offense weigh heavily in favor of a period of incarceration.

Weisberg is a recidivist and his conduct was egregious. He lied repeatedly to assist Saltsman and Eitan, and he lied repeatedly to SIAM so that he could embezzle money from SIAM's escrow account. Moreover, Weisberg is an extremely well-educated lawyer, who clearly knows right from wrong, and clearly understood the nature and effects of his actions. In fact, contrary to Weisberg's claims that his criminal acts were simply "lapses in judgment," the evidence has shown that Weisberg's conduct was cold, calculated and intentional.

For example, before Weisberg lied to the SEC in connection with the September 2003 comment letter, he was advised by another lawyer that he should simply withdraw the registration statement on Ramp's behalf. Instead of doing the right thing, and withdrawing the registration statement,

36

Weisberg lied to the SEC to assist Saltsman and his trading strategy.  Additionally, as discussed above, Weisberg continued the scheme by lying to Ramp's auditors when the auditors began to ask questions.  Those actions are not those of a man who simply had a lapse in judgment.  To reinforce that point, one need look no further than Weisberg's fraudulent conduct in dealing with TriState at the same time that he was defrauding SIAM.  That conduct was egregious and calculated.

In sum, the nature and circumstances of the offenses in this case — and specifically, the duration, the scope, and amount of loss caused — weigh heavily in favor of a period of incarceration.

II.  <u>A Period of Incarceration Would Be Sufficient, but Not Greater than Necessary, to Meet the Needs Set Forth in § 3553(a)(2)</u>

Section 3553(a)(2) requires a district court, in determining the particular sentence to be imposed, to consider the need for the sentence imposed to accomplish certain goals, such as the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and the need "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant."  With respect to § 3553(a)(2), a district

37

court must impose a sentence that is "sufficient, but not greater than necessary," to comply with the above-referenced needs. In this case, only a sentence of incarceration would accomplish those goals.

      A.   The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

First, a Guidelines sentence would reflect the seriousness of the offenses, which as discussed above were extensive in terms of its duration, scope, and amount of loss. Second, Weisberg, an attorney who repeatedly and routinely flouted the law, has demonstrated that he has little respect for the law. Third, a sentence of incarceration would certainly provide "just punishment" for someone who on multiple occasions, in connection with separate offenses, lied, cheated, and stole for personal gain.

      B.   The Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant

A sentence of incarceration would also provide general and specific deterrence. First, it would send a strong message to others in the legal community who might contemplate engaging in similar criminal conduct that if they chose to do so the consequences could be severe. A term of imprisonment would also

38

serve as an important deterrent to those involved in other types of fraud, and would aid in maintaining the public's confidence in our legal system.

Second, a sentence of incarceration is necessary to provide specific deterrence. In this regard, it is notable that Weisberg claims that his acts were the result of "lapses in judgment." Given the nature of defendant's multiple crimes, and taking into account the history and characteristics of the defendant (as discussed below), makes it all the more likely that if given the opportunity, Weisberg might attempt to deceive others once again. A sentence of incarceration would certainly assist in making sure Weisberg never gets that chance.

III. <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct Weighs Heavily in Favor of a Guidelines Sentence</u>

Section 3553(a)(6) requires a district court, in determining the particular sentence to be imposed, to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In this case, a sentence of incarceration is warranted.

As is evident, the defendant engaged is three separate schemes (the PIPEs case, the Escrow Fraud case, and the TriState

39

conduct), and the loss he caused (more than $4.1 million alone in the PIPEs case) squarely calls for a sentence of incarceration.  Yet, Weisberg's recommendation of probation would rank him at the very <u>bottom</u> of similar defendants, and would amount to nothing more than a slap on the wrist.  Such a result would be unwarranted and not in keeping with the goals of § 3553(a)(6).

In sum, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct weighs heavily in favor of a sentence of incarceration.

IV.  <u>Weisberg's History and Characteristics Do Not Justify a Sentence Significantly Below the Guidelines</u>

Weisberg's sentencing memorandum suggests that his "history and characteristics" somehow warrant a sentence of probation.  <u>See</u> 18 U.S.C. § 3553(a)(1).

For example, Weisberg portrays himself as an honest lawyer who for thirty years provided high quality, meticulous legal advice to all of his clients.  Def. Memo. at 16.  In describing his past legal employment in New York City, he suggests that he simply moved from law firm to law firm without incident.  For example, he states that "[i]n 1987, he joined Morgan Lewis & Bockius, from which he was recruited to Shea &

40

Gould in 1991" and that he remained with Jenkins & Gilchrist "until the firm declared bankruptcy [in 2005], and then joined the corporate group at Baker & McKenzie in the summer of 2005." Weisberg's summary of his legal experiences is misleading.

In fact, Weisberg's legal career was marked by significant negative events.  In 1991, Weisberg was indicted by a federal grand jury in connection with conduct that he allegedly engaged in while a partner at Morgan Lewis & Bockius.[16] Additionally, in 2005, Weisberg and other attorneys from the New York office of Jenkins & Gilchrist joined the firm of Troutman Sanders.  Within weeks of joining Troutman Sanders, Weisberg was asked to leave the firm because he refused to follow a managing partner's instruction to discontinue representation of Ramp Corporation.  As noted in the Presentence Investigation Report, Weisberg "disobeyed instructions with respect to proposed work for a client."  PSR 128.  That client was Ramp.

Additionally, in response to Weisberg's sentencing memorandum, Baker & McKenzie submitted a letter to describe the harm Weisberg caused the firm and to aid the Court in sentencing.  Baker & McKenzie's description of Weisberg's conduct is in stark contrast to Weisberg's claim that he was an

---

[16] Weisberg was indicted in connection with a money laundering conspiracy and was acquitted at trial.

41

honest and diligent attorney.  For example, Baker & McKenzie

conducted an internal investigation after learning of Weisberg's

indictment and determined that Weisberg "failed to make

appropriate disclosures to the [f]irm, opened unauthorized

escrow accounts for [f]irm clients, violated other clear [f]irm

policies and procedures and engaged in other highly questionable

activities that were inconsistent with the stringent ethical

standards to which the [f]irm adheres."  Letter of William

Linklater, Esq. at 2 (Docket #211 of the PIPEs case).  Moreover,

"from the outset, [Weisberg] engaged in a continuum of

clandestine activities that were wholly incompatible with his

duties to the [f]irm and its clients," and Weisberg "sullied

[the firm's] good name by repeated instances of unprofessional,

if not illegal, activities."  Id. at 3.

> A.   Weisberg Lied to Probation About His Assets

This defendant's misrepresentations to Probation about

his interest in United Stations Radio Network ("United

Stations") are also indicative of Weisberg as a person.

For example, according to paragraph 131 of the

Presentence Investigation Report, the defendant "listed 5%

ownership in United Stations Radio Networks [sic], purchased in

1984 for $5,000.   The defendant estimated its value to be

between $2,000,000 and $3,000,000.  However, he noted that this business was recently foreclosed upon and **no ownership remains**." (Emphasis added.)  In his letter to Probation, dated March 6, 2013, the defendant further stated, "The last sentence [of paragraph 131] should be revised to reflect that Mr. Weisberg's stock in United Stations was foreclosed upon (not the business itself) and accordingly **he no longer has an ownership interest in the company**." (Emphasis added.)

In fact, investigation by the government has revealed that the defendant transferred his equity share in United Stations to his wife Tracey Weisberg in 2012, prior to his guilty plea.  United Stations is a closely-held corporation, with programming assets that are sold or licensed to radio stations.

The defendant's role in United Stations before and after the transfer of his shares to his wife remains unchanged. Conference calls among members of the Board of Directors of United Stations have been – both before and after the guilty plea – presided over by the defendant, who continues to identify himself as the Secretary of the Board.  The defendant kept and maintained the minutes of the Board and shareholder meetings. The defendant conducts United Stations business in the same

capacity after the guilty plea as he did before.  In addition,
at no time has Tracey Weisberg identified herself as present on
any telephonic meetings (or in-person meetings), nor does she
appear to be anything other than a straw nominee for the
defendant.

Earlier this month, the defendant proctored a
shareholder meeting for United Stations.  The defendant himself
circulated to all the shareholders notices dated May 3, 2013,
and it was the defendant who set the agenda – which consisted of
ousting a founding Board member.  This Board member had for the
past year expressed ethical objections to the defendant's
continued active role in United Stations after the defendant had
pleaded guilty to two felonies involving fraud.

It was the defendant who gave the "call-in" telephone
number to the shareholders meeting via e-mail on the morning of
May 16, 2013.  Once again, the defendant presided over the
United Stations shareholders meeting as Secretary.  At no time
was Tracey Weisberg identified as being present on the line.

The defendant took a voice vote and the targeted Board
member was removed from the Board.  When there was an attempt to
raise other matters at the shareholder meeting, the defendant

squelched discussion of those other matters, citing that only the removal of the Board member was on the agenda.

The defendant was the attorney for United Stations for years.  Only recently did the company retain an attorney with Morrison Cohen LLP.  However, the defendant remains active in the business of United Stations and has not ceased billing it for what he terms "consulting" services; the defendant is believed to have a retainer in excess of $200,000.  The defendant is also believed to receive funds from United Stations via an entity not bearing his name, preliminarily identified as "DMBM."

Although closely-held corporations are usually difficult to value, in this case a third party offered to buy United Stations for $52 million within the past year.  Also during that time, a long-time shareholder offered to buy out the other shareholders for $46 million.  We understand there has been a great deal of acrimony and accusations among shareholders, and there is presently litigation in New York Supreme Court.  Two shareholders recently agreed to be bought out by the faction controlled by the defendant.  One shareholder was bought out earlier this month based on a $25 million

45

valuation of United Stations; the second shareholder is expected
to agree to a similar arrangement shortly.

In sum, the defendant's statements about his interest
in United Stations are wholly misleading, if not outright lies.

Moreover, the way in which defendant described his
criminal case to United Stations directors and shareholders
provides a window into his character.  In January, February, and
March of 2012, the defendant maintained that his criminal case
would "go away."   He stated that the indictment was nothing
other than retribution for a previous case that he had won
against the government.[17]

The defendant stated that Dick Clark – the radio and
television personality who had also been a United Stations
shareholder – testified as a character witness in the 1991 trial
in which the defendant was acquitted.  Weisberg said that Mr.
Clark was going to testify as a character witness in court or by
video at the next trial, but Mr. Clark passed away in April
2012.

---

[17] As noted above, in 1991, federal prosecutors in Texas charged
the defendant with conspiring with his clients to defraud
investors in a currency-trading scheme.  The defendant was
acquitted at trial later that year; the other defendants in the
case were convicted.

After the defendant pleaded guilty in the instant cases on May 21, 2012, the defendant advised United Stations of the plea.  In a meeting attended by the defendant and all the shareholders - seven in person, and two others on the telephone - the defendant, a lifelong attorney, said that the only thing he regretted was that he lied under oath to make the case go away.  The defendant maintained his innocence and minimized the likelihood of having to go to prison.  The defendant asserted that he was a victim of an overzealous prosecution, and that he wanted to spare his family any additional stress.  He further explained that "a black woman" would testify against him and that in Brooklyn this would weigh against him.

### B.   Weisberg's Lies About Oceanic Indemnity

The government has also learned that Weisberg recently lied to a lawyer, Mr. Andrew J. Maggio, Esq., in connection with a business dispute involving Qualcon Construction LLC.  See Affirmation of Andrew J. Maggio, Esq. (Attached as Exhibit CC). As noted on the attached affirmation, it appears that fraudulent lien discharge bonds were issued by Oceanic Indemnity (referenced above) in connection with a construction project with Consolidated Edison Company of New York.  Weisberg signed those bonds as attorney in fact for Oceanic Indemnity.  Id.  In

47

an attempt to obtain funds on behalf of his client, Maggio contacted Weisberg, who apparently held money in escrow in connection with the construction lien. Weisberg told Maggio that Weisberg was not holding the funds, and that Maggio should contact Michael Kelly. Weisberg also stated that he had very little involvement with Oceanic Indemnity. In fact, Weisberg stated that he stated that his only interaction with Oceanic Indemnity was in connection with an acquisition of an insurance company. Weisberg stated that the acquisition was not successful. Id.

Weisberg's representations to Maggio about his prior involvement with Oceanic Indemnity were false and misleading. First, Weisberg previously provided a letter from Oceanic Indemnity to Ginsberg and SIAM as a purported defense to the Escrow Fraud case. Second, as referenced above, Weisberg worked with Michael Kelly in connection with the Tristate transaction. Third, based on documents submitted to the insurance fraud department of New York State, Weisberg had been previously involved with Oceanic Indemnity in bond deals similar to Qualcon. See Sunvest Complaint and Documents (Attached as Exhibit V).

48

Those false representations are further evidence of the defendant's deceitful and cunning personality.

V.   Other § 3553(a) Factors

Other factors identified in § 3553(a) do not appear to be applicable to the case at hand.  See 18 U.S.C. § 3553(a)(2)(D) ("vocational training or other correctional treatment"); § 3553(a)(3) ("the kinds of sentences available"); § 3553(a)(5) ("any pertinent policy statement").

CONCLUSION

For the foregoing reasons, the government respectfully urges this Court to sentence Weisberg to a term of imprisonment.

Dated:   Brooklyn, New York
         May 31, 2013


                                   LORETTA E. LYNCH
                                   United States Attorney
                                   Eastern District of New York


                                   Ilene Jaroslaw
                                   John P. Nowak
                                   Assistant U.S. Attorneys
                                   (718) 254-6236/6097

49