FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  07/05/2006

JORDAN YOUNG, was interviewed at the offices of the United States Attorneys for the Eastern District of New York, with his attorney ▇▇▇▇▇▇▇. Also present were Assistant United States Attorney John Nathanson and Suzanne McDermott, and John Nowak of the SEC. After being advised of the identity of the interviewing agents and the purpose of the interview YOUNG provided the following information:

YOUNG was showed the response to the SEC comment letter to the RAMP registration statement dated August 27, 2003. The key point was the language which stated "we may do additional financing". YOUNG was also shown the SEC comment letter dated September 22, 2003, related to the RAMP registration statement. YOUNG was then shown an email from ZEV SALTSMAN which forwarded the comment letter to MARTIN WEISBERG on September 22, 2003.

Prior to this date YOUNG had done some minor work on XYBR and OBJECTSOFT, two companies that SALTSMAN was involved with. On the OBJECTSOFT transaction YOUNG worked for ▇▇▇▇ ▇▇▇▇▇▇▇ a partner at JENKINS and WEISBERG worked for SALTSMAN on the transaction.

SALTSMAN did multiple convertible transactions with OBJECTSOFT, XYBR and RAMP. All of these companies had malfeasance by the CEO's. ▇▇▇▇▇▇▇▇▇ was the CEO of OBJECTSOFT and he was fired for stealing money from the company. EDWARD NEWMAN, the CEO of XYBR, was let go for expense related malfeasance. ANDREW BROWN, the CEO of RAMP, was also let go for malfeasance.

YOUNG recalls being shown the SEC comment letter by WEISBERG prior to the meeting on September 23, 2003, with ANDREW BROWN, ▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇▇, SALTSMAN and ▇▇▇▇▇ ▇▇▇▇▇▇▇ and maybe ▇▇▇▇▇▇▇▇▇▇▇▇▇.

YOUNG had met SALTSMAN previously at the offices of JENKINS and GILCHRIST. SALTSMAN was a PIPE investor for about 10-15 years. ▇▇▇▇▇▇▇▇▇ had told YOUNG that the money SALTSMAN invested was mainly MENACHEM EITAN's. To YOUNG SALTSMAN and EITAN were the same guy. YOUNG never meet and maybe never even heard of EITAN before this meeting. SALTSMAN is the talker

Investigation on  6/30/06       at  EDNY

File # ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇     Date dictated

by ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

Exhibit A

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Jordan Young__ , On __6/30/06__ , Page __2__

and the brow beater and EITAN is the quiet one that doesn't say much just listens.

YOUNG was shown the JENKINS billing records related to the meeting. At the meeting it was discussed that JENKINS would become counsel and SALTSMAN was involved in this occurring. SALTSMAN was funding the company at the time. In the real world ▓▓▓▓▓▓▓ was the CEO but SALTSMAN was the one writing the checks. ▓▓▓▓▓▓▓ wasn't effective at getting the liquidity events that SALTSMAN needed for his investments. ▓▓▓▓▓▓▓ had developed a bad relationship with ▓▓▓▓▓▓▓ the person at the SEC that was reviewing the registration statement.

SALTSMAN had a personal relationship with WEISBERG and BROWN had worked with SALTSMAN before but YOUNG didn't recall how YOUNG knew this. ▓▓▓▓▓▓▓ told YOUNG and WEISBERG that they could make ▓▓▓▓▓▓▓ into the bad guy. YOUNG may have said that they were going to say something like prior counsel was not familiar with securities law and that YOUNG had worked at CORP FIN and could work with the SEC.

The second thing discussed at the meeting was the general shape of the registration statement. The registration statement was terribly written. It had seemed that ▓▓▓▓▓▓▓ used a draft from 20 years ago and hadn't looked at the rules since then.

The third thing that was discussed was if and when they sold shares during the pendency of the registration statement that the company would be in violation of section 5 because the registration statement is considered a general solicitation.

This would have been catastrophic for SALTSMAN and the company. The company was living deal to deal and was burning cash at a very high rate with no revenue coming in. SALTSMAN would have to wait six months for his shares and YOUNG knew that SALTSMAN was short selling. YOUNG knew this because he would always try and put a no short selling clause in the deals that YOUNG did and SALTSMAN would never allow that clause in the deals he did. SALTSMAN had his capital tied up and needed to sell his shares. Also SALTSMAN always knew whether explicit or not that the notes he got would be re-converted in to shares, it was obvious.

Exhibit A

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Jordan Young__ , On __6/30/06__ , Page __3__

    YOUNG's first though about the registration statement was that it was poor language when it said "may do additional financing". At some point it became obvious that there was additional financing that were done because VFINANCE had gotten warrants. YOUNG told everyone at the meeting that you couldn't do that because it was a section 5 violation. Nobody was on board with that and VFINANCE said don't need to register the warrants that they got.

    Some sort of financing occurred over the summer and YOUNG doesn't recall if it was at this meeting or another meeting when BROWN talked about a friends and family offering that the company did. YOUNG stated that the company couldn't do that and the company had to pay the investors back.

    Additionally, the company wanted to raise additional money and YOUNG discussed issuing notes, doing a Reg S financing and trying to fit a financing in under the Black Box Squadernall exception. YOUNG also thought that the SEC may allow it if the company went back to the same investors to reinvest.

    Part of the pressure that SALTSMAN put on the company was that he determined what shares are registered on the particular registration statement that the company had filed.

    YOUNG believed that once the registration statement became effective the company could pretty much do anything it wanted because CORP FIN only looks a company once and YOUNG articulated this at the meeting.

    YOUNG spoke to the SEC and wrote a letter to ▓▓▓▓▓ ▓▓▓▓▓ at the SEC. WEISBERG directed YOUNG to do this as a client relationship type thing because YOUNG knew that the SEC wouldn't go along with what YOUNG and the company were asking.

    YOUNG recalls listening to voice mails from ▓▓▓▓▓ ▓▓▓▓▓ that ▓▓▓▓▓ played for YOUNG and WEISBERG. This was to show that ▓▓▓▓▓ and ▓▓▓▓▓ were not getting along but YOUNG doesn't recall the substance of the calls, other than that they were uncivil.

    YOUNG spoke to ▓▓▓▓▓ about what YOUNG was going to say in the letter to the SEC. YOUNG told WEISBERG that he was not happy about the letter and that YOUNG was putting it under WEISBERG's letterhead and WEISBERG said that YOUNG could sign

Exhibit A

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Jordan Young_____ , On _6/30/06_____ , Page __4__

    it. YOUNG told WEISBERG that he wouldn't sign it and WEISBERG knew damn well why YOUNG wouldn't sign it. The letter was inaccurate and YOUNG thought it was odd that WEISBERG wanted YOUNG to sign it. The language in the letter that said "not made... not making" was blatantly false.

    YOUNG was shown an email dated September 26, 2003. YOUNG didn't trust any of the people he was dealing with and he didn't want to be sandbagged. This was why he sent this email. Once going down this path you try to keep it a secret. At one point YOUNG said to everyone you know if anybody pokes around you are screwed. They all said transaction was void.

    The transaction was backdated to September 30, 2003, because RAMP had an accounting program had to make it in the quarter. At some point pressure was put on the auditors to along with this story. At some point shareholder approval and beneficial ownership were an issue as well.

    RAMP was going to acquire another company and YOUNG said the company should get shareholder approval and they said no. The company needed to discrete purposes, one which was to acquire another company and the second was for working capital. You also need to have separate investors. Everyone understood that SALTSMAN controlled the entities and YOUNG never saw the documentation setting up the corporations that invested. The SEC asks for the natural person who has voting and dispositive control over the shares.

    YOUNG wasn't comfortable saying that these are independent entities but YOUNG had legal comfort although it was cold comfort. YOUNG knew that some violations of the law were taken place. YOUNG was in a bad position and made a bad discussion.

    RAMP was giving away a staggering amount of shares and it was a ridiculous discount to the market, it was almost ursary. This was twice as bad as anything that YOUNG had ever seen before.

    SALTSMAN controlled RAMP at this time. What was material was that someone you don't see is really controlling the company.

Exhibit A

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __Jordan Young__, On __6/30/06__, Page __5__

One of the ways to keep the stock price up is to do a reverse stock split. SALTSMAN didn't need a high price, because he is converting and selling instantaneously with floating conversions.

YOUNG was shown an email from ▓▓▓▓▓ on September 26, 2003. This was ▓▓▓▓▓ rationalizing what happened and this is how to lie to the SEC. ▓▓▓▓▓ and ▓▓▓▓▓, who represented the SALTSMAN entities didn't express any concerns.

YOUNG was shown an email from SALTSMAN dated October 8, 2003. SALTSMAN sent numerous emails expressing concerns over when things would be done.

▓▓▓▓▓ drafted disclosures of all the transactions that had occurred. This disclosure was inconsistent with what YOUNG, WEISBERG and the company were doing. YOUNG had told WEISBERG that the language ▓▓▓▓▓ had written didn't work. YOUNG and WEISBERG changed the language to make it correct but deceptive.

YOUNG was shown an email dated October 23, 2003, sent to the AMERICAN STOCK EXCHANGE. This was not accurate because SALTSMAN controlled all the money it was his money. Whenever YOUNG says SALTSMAN he means SALTSMAN and EITAN because he believes they are one and the same.

YOUNG was shown an email dated November 10, 2003, from ▓▓▓▓▓ and the response YOUNG wrote. In the response there were at least two things that were inaccurate. One it was not a Regulation S transaction. Two the dates were taken out to disclose deal and not show that it was done during the pendency of the registration statement.

YOUNG was shown a letter dated October 30, 2003, sent to the AMEX. SALTSMAN was concerned about getting things thru the SEC and the AMEX, the dates and the timing didn't matter because SALTSMAN knew what he was getting. YOUNG would call SALTSMAN and ask him the name of the entity and SALTSMAN would tell YOUNG the name of the entity that was investing.

The whole thing is a legal fiction. All technically great but underneath it is all one guy. This was wilful

Exhibit A

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____Jordan Young_____, On __6/30/06____, Page __6__

blindness. YOUNG felt that legally and technically he had coverage as a lawyer.

The issue of shareholder approval was an issue but not at the September 23, 2003, meeting. This became an issue when they were pressuring the auditors. It was felt that this was a no harm no foul situation more so than the section 5 violation.

YOUNG was shown a letter sent to the auditors from WEISBERG. YOUNG believes that he drafted a portion of this letter. YOUNG sat with WEISBERG and took notes. YOUNG made the suggestion of disclosure.

YOUNG was shown an email from the auditors dated November 7, 2003. YOUNG never told the auditors that the agreement was dated September 30, 2003, just to get it in the quarter. WEISBERG had stated that they needed to get the auditors on board with the transaction. The auditors were saying money came in and there were deals and then it became short term debt.

YOUNG was shown an email to ▓▓▓▓▓▓ about the VFINANCE warrants. This was discussing the same issue and that there had been an illegal deal done. YOUNG felt that ▓▓▓▓▓▓ and ▓▓▓▓▓▓ and ▓▓▓▓▓▓ were guilty of malpractice.

All of the people involved in these transactions were greedy and always took the dishonest and more profitable approach. Every time they could have taken a path to fix the problem they took the dishonest and greedy approach.

YOUNG had general conversations with ▓▓▓▓▓▓ about his concerns. YOUNG said SALTSMAN controls all of it and that YOUNG had to get off the client. ▓▓▓▓▓▓ said that "that's ZEV". ▓▓▓▓▓▓ was then put on working for RAMP. ▓▓▓▓▓▓ did express discomfort with working with SALTSMAN.

▓▓▓▓▓▓▓▓▓▓ was a guy that YOUNG confided in at JENKINS. ▓▓▓▓▓▓ got YOUNG taken off the RAMP matters. ▓▓▓▓▓▓ works at KRAMER LEVIN now.

At some point YOUNG found out that RAMP had sold stock to a whole bunch of people during the pendency of the registration statement. YOUNG worked on a couple of settlement agreements, one of which was for PLATINUM PARTNERS.

Exhibit A

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___Jordan Young_____, On _6/30/06_____, Page __7__

    The company REAL IMAGE rings a bell but YOUNG can't recall why.

    At one point WEISBERG gave proprietary client material to from one of the firms clients AQUA WELLINGTON to one of WEISBERG's clients ▓▓▓▓▓▓▓▓ and ▓▓▓▓ something. YOUNG believes that ▓▓▓▓ had something to do with SETENDOWN.COM. INTERCOASTAL which is a broker dealer is associated with ▓▓▓▓. ▓▓▓▓▓▓▓▓▓▓ was a person that was associated with AQUA WELLINGTON. When they found out about this they fired WEISBERG and hired ▓▓▓▓▓.

    YOUNG heard that ▓▓▓▓▓▓▓, tax counsel at JENKINS, put together an offshore investment vehicle that WEISBERG and SALTSMAN were co-investors in. YOUNG believes that ▓▓▓▓ told him this.

    ▓▓▓▓▓▓▓▓▓ is a colorful person. He had an office next to WEISBERG but was not an attorney. He had a California company and does stuff in Europe. ▓▓▓▓▓ is a finder of investors for companies, generally private companies. ▓▓▓▓▓ brought clients to WEISBERG. He asks high fees for what he does and is close to WEISBERG. ▓▓▓▓▓ brings money into companies and they engage WEISBERG to do the financing.

Exhibit A